Jake AYERS, Sr., et al., Plaintiffs,

United States of America,
Plaintiff–Intervenor,

v.

William ALLAIN, Governor, State of Mississippi; W. Ray Cleere, Commissioner of Higher Education; Board of Trustees of State Institutions of Higher Learning, Betty A. Williams, President, Thomas D. Bourdeaux, Vice President, William H. Austin, Jr., Frank O. Crosthwait, Jr., Bryce Griffis, Will A. Hickman, Charles C. Jacobs, Jr., William M. Jones, John R. Lovelace, M.D., Diane Miller, Denton Rogers, Jr., Sidney L. Rushing, George T. Watson, Members; Delta State University, Kent Wyatt, President; Mississippi State University, Donald W. Zacharias, President; Mississippi University for Women, James W. Strobel, President; University of Mississippi, R. Gerald Turner, Chancellor; University of Southern Mississippi, Aubrey K. Lucas, President; et al., Defendants.

No. GC75–9–NB.

United States District Court,
N.D. Mississippi,
Greenville Division.

Dec. 10, 1987.

Alvin Chambliss, Jr., Oxford, Miss., Le-Vern Younger, Civ. Rights Div., Educational Opportunities Litigation Section, U.S. Dept. of Justice, Washington, D.C., for plaintiffs.

Edwin L. Pittman, Atty. Gen., Ed Davis Noble, Jr., Asst. Atty. Gen., William F. Goodman, Jr., Paul H. Stephenson, III, William F. Ray, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

BIGGERS, District Judge.

This class action was commenced on January 28, 1975. The plaintiffs alleged that the defendants were maintaining a racially dual system of public higher education in violation of the Fifth, Ninth, Thirteenth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1981 and 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* On April 21, 1975, the United States, by its Attorney General, filed its complaint-in-intervention pursuant to the Fourteenth Amendment, §§ 601 and 602 of Title VI and § 902 of Title IX of the Civil Rights Act of 1964, 42 U.S.C. § 2000h–2. The United States alleged, *inter alia,* that actions of the defendants maintained and perpetuated an unlawful dual system of higher education based on race in violation of the Fourteenth Amendment and Title VI. The plaintiffs essentially seek injunctive relief directing the defendants to bring the various components of Mississippi's public system of higher education into conformity with the

requirements of the aforementioned statutes and constitutional provisions.

## I. Introduction

The plaintiffs are black citizens of the State of Mississippi, including black students attending or desirous of attending public institutions of higher learning in the State of Mississippi, black taxpayers residing in the State of Mississippi, and parents of black students attending public institutions of higher learning in the State of Mississippi. The chief defendants are the Governor of the State of Mississippi, the Board of Trustees of State Institutions of Higher Learning, and the individual members sued in their personal and official capacities, each of the institutions identified as the historically white institutions and their chief administrative officers, the State Department of Education, and the State Superintendent of Education.

All public institutions of higher learning in the state are under the management and control of the Board of Trustees of State Institutions of Higher Learning (Mississippi Constitution of 1892, § 213-A), whose authority is plenary. The defendant State Department of Education is charged with the execution of laws relating to the administrative, supervisory, and consultive services to the public schools, agricultural high schools, and junior colleges of the State of Mississippi. The defendant State Superintendent of Education is responsible for the administration, management, and control of the Department of Education, subject to the direction of the State Board of Education. Miss.Code Ann. § 37-3-5 (1972).

The private plaintiffs and the United States assert that at the time of the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the defendants had established racially separate systems of public higher education for black and white citizens of Mississippi; that the institutions designated to serve blacks were markedly inferior to the institutions established by defendants to serve whites; that from 1954 until the present defendants have maintained and perpetuated the racially dual system of public higher education through, *inter alia*, policies and practices governing student admissions, employment of faculty and administrative staff, and through the operation of historically white institutions or branches thereof in close proximity to historically black institutions; that the defendants have denied equal educational opportunity to black students and faculty by discriminating against historically black institutions with respect to, *inter alia*, institutional missions, number and level of academic programs, quality of instructional staff, allocation of land grant functions, the level and quality of physical plant, and the distribution of financial resources; and that defendants have failed to effectively dismantle the racially dual system of public higher education in Mississippi and remain today under legal obligation to eliminate the vestiges of racial dualism "root and branch."

The defendants answered the allegations of the plaintiffs and the plaintiff-intervenor by contending that a good faith nondiscriminatory and nonracial admissions and operational policy with respect to students, faculty, and staff has been implemented and maintained in the state-wide system of public higher education; and that with such a policy designed to insure equality of opportunity, the mere continued existence of institutions of higher learning with predominantly black and predominantly white student bodies and faculty does not represent a denial of equal protection, considering individual freedom of choice of all qualified students, black and white, to enroll in the colleges of their choice, and the varying educational objectives and advantages of such institutions. The defendants contend further that throughout the state-wide system there have been affirmative-action programs designed to attract qualified black students and personnel to historically white institutions and to attract qualified white students and personnel to historically black institutions; that equal protection has been and is achieved by the operation of a state-wide system dedicated to the enhancement of integrated university opportunities coupled with the goal of quality education; that a fully integrated unitary state-wide

system of higher education exists in Mississippi today wholly untainted by discriminatory actions or purposes; and that within such a system the achievement of particular proportions or percentages of desegregation must be judicially evaluated with other legitimate educational and societal interests.

Pursuant to 28 U.S.C. § 2281, a three-judge court was convened to preside over this cause. On September 17, 1975, by order issued by Judge William C. Keady (then Chief Judge of the United States District Court for the Northern District of Mississippi and acting in his capacity as managing judge of the three-judge court), a plaintiff class was certified and defined as:

> All black citizens residing in Mississippi, whether students, former students, parents, employees, or taxpayers, who have been, are, or will be discriminated against on account of race in receiving equal educational opportunity and/or equal employment opportunity in the universities operated by said Board of Trustees.

On the same day, this court ordered the separation for trial purposes of the claims against the senior colleges and universities, that is, the Institutions of Higher Learning and the Board of Trustees of State Institutions of Higher Learning, from the claims against the sixteen public junior colleges, the Junior College Commission, and the Department of Education.

During the approximately twelve years since this case was filed until the present, considerable time and effort have been devoted by the parties, under the court's auspices, toward the consensual resolution of the many issues raised herein. After repeated good faith attempts failed to achieve a mutually satisfactory comprehensive agreement, this court[1] ordered the completion of discovery and set this cause for trial to commence on April 27, 1987. Having heard the evidence presented during a five-week bench trial, during which the court heard testimony from 71 witness-

es and received 56,700 pages of exhibits, and now having maturely considered the testimony, exhibits and post-trial memoranda submitted by the parties, the court is in a position to enter its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## II. Findings of Fact

### A. History and Overview of the System of Higher Education

The Board of Trustees of State Institutions of Higher Learning (hereinafter referred to as "the Board of Trustees") was created by statute in 1932. In 1944 it became a constitutional board with plenary power over all Mississippi public senior colleges and universities. The Mississippi state-wide system of higher education consists of eight institutions and several entities under the jurisdiction of the Board of Trustees. The eight institutions of higher learning under the Board of Trustees' control are described as follows:

#### University of Mississippi

Chartered on February 24, 1844, the University of Mississippi, at Oxford, commenced its first session on November 6, 1848, with a faculty of four members. The trustees and the faculty sought to broaden the work of the institution by the creation of professional and specialized schools so as to build it into a university in fact as well as in name. In accordance with that purpose, the School of Law was opened in 1854.

Coeducation came with the admission of women students in 1882, and the first woman was added to the faculty in 1885. The first summer session was held in 1893, the School of Engineering was established in 1900, and the Schools of Education and Medicine were opened in 1903. Subsequently, the School of Pharmacy was created in 1908, the School of Commerce and Business Administration in 1917, the graduate school in 1927, and the School of Nursing in 1958.

---

1. In May, 1985, the three-judge court was dissolved and this cause was transferred to the present judge for further proceedings.

The legislature mandated that the University of Mississippi serve white persons only.

### Alcorn State University

Alcorn State University, initially designated as Alcorn Agricultural and Mechanical College, the oldest land grant college for blacks in the United States, had its beginning in 1830 when the Presbyterian Church established Oakland College for the education of white male students in the southwestern region of the state. The Presbyterian school closed its doors at the beginning of the civil war and upon failing to reopen after the war the college was purchased by the state and renamed Alcorn University in 1871, in honor of the late James L. Alcorn who was then Governor of the State of Mississippi.

In accordance with the Morrill Land Grant Act, the Mississippi State Legislature renamed Alcorn University as Alcorn Agricultural and Mechanical College of the State of Mississippi and designated it to serve as an agricultural college for the education of Mississippi's black youth.

### Mississippi State University

In 1878, the legislature established the Mississippi Agricultural and Mechanical College and located it at Starkville, Mississippi. It was opened to students in 1880 and, in 1930, the institution was made coeducational. In 1932, its name was changed by act of the legislature to Mississippi State University of Agriculture and Applied Science. The University is organized for resident teaching, agricultural research, and agricultural extension. The School of Engineering was organized in 1902, the School of Agriculture in 1903, the School of Education in 1935, the School of Business in 1915, and the School of Arts and Science in 1956. The graduate school, organized in 1936, offers courses leading to the Master of Science degree and Doctor of Philosophy degree in the fields of study and investigation which are distinctly in the land grant program of higher education. Additional divisions and activities are: the Business Research Station, Department of Adult Education and General Extension, Department of Military Science and Tactics, State Plant Board, State Chemical Laboratory, State Seed Testing Laboratory, the Engineering and Industrial Research Stations, Agriculture Extension Service, and Agriculture Experiment Station.

Student enrollment at Mississippi State University was restricted to white persons only by act of the legislature.

### Mississippi University for Women

The Industrial Institute and College was established by the legislature in 1884 as the first state-supported college established exclusively for the higher education of women in the United States. The college was located at Columbus, Mississippi and opened its first session in 1885 with Professor R.W. Jones as president. The industrial feature made it possible for women, who otherwise would not have attended college, to work their way through college. The growth of the institution was rapid and steady, almost every year seeing new buildings and new features added. In 1922, its name was changed from Industrial Institute and College to Mississippi State College for Women. Departments are maintained in liberal arts, home economics, music, art, secretarial science, teacher education, and library science. Mississippi University for Women was established by an act of the legislature approved on March 12, 1884 for the education of white women in the arts and sciences.

### University of Southern Mississippi

The University of Southern Mississippi is located in Hattiesburg, Mississippi, and was established by an act of the legislature in 1910 under the name of Mississippi Normal College. Its purpose, primarily, was the training of teachers for the public schools of the state. Its first session was opened in 1912. In 1924 the name of the institution was changed to State Teachers College, and changed again by the legislature in 1940 to Mississippi Southern College, and changed again in 1962 to its present name. With the changes in name, there have been changes in function and

curricular of the institution. In 1947, graduate work in the fields of education and music were authorized and the Institute of Latin American Studies was organized. In 1957, the Board of Trustees reorganized the college, establishing schools of arts and sciences, education and psychology, commerce and business administration, and graduate studies.

Student enrollment at the University of Southern Mississippi was restricted to white persons only by act of legislature.

### Delta State University

Delta State College was established in 1924 by an act of the legislature and its doors were opened for students the following year. It is located at Cleveland, Mississippi in the Delta region. It is among the youngest of the state's institutions of higher learning. Delta State University confers bachelor of science degrees in education and gives courses in music and art. It also provides a standard liberal arts program leading to the Bachelor of Arts degree.

### Jackson State University

Jackson State College, a predominantly black institution located on approximately 50 acres of land in the City of Jackson, Mississippi, was transferred to the State of Mississippi in 1940 to become a training school for black teachers. The instructional program includes liberal arts and teacher education, with nursing and graduate education also offered.

Jackson State University was established by an act of legislature on May 6, 1940, for the purpose of training black teachers for the black public schools of this state.

### Mississippi Valley State University

Mississippi Valley State College was established in 1946 by the legislature for the purpose of educating teachers primarily for rural and elementary black schools and to provide vocational training for black stu-

dents. The college is located at Itta Bena, Mississippi. It opened its doors to students in 1950 and has grown into an institution primarily geared toward community service and adult education.

The Board of Trustees is charged with the duty to manage and control the eight public universities. The powers and duties of the Board of Trustees include, *inter alia,* control over all funds appropriated and taxes allocated by the legislature for support and maintenance of the institutions; approval of new academic programs and departments; approval of individual institutional and state-wide capital and operational budgets; approval of admission standards and procedures for each institution (U.S. Exhibit 636).

At the time the United States Supreme Court issued the decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), declaring that the "separate but equal" principle set forth in *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) was no longer the law and that racially segregated public education was inherently unequal, Mississippi's higher education system was both separate and unequal. In 1954, the Board of Trustees issued a report entitled the "Brewton Report" which attempted to describe the relative disparities existing in the system of higher education in terms of the comparative opportunities available to white and black citizens. The report stated that, as of 1954, the educational opportunities available to black citizens at the university level were limited to teacher education, agriculture and mechanical arts, and the practical arts and trades, whereas white citizens enjoyed a full range of program offerings. The report goes on to note the efforts undertaken by the state and the Board of Trustees to improve the number and level of program offerings available to black citizens in an effort to equalize opportunities.[2]

2. In 1954, H.M. Ivy, President of the Board of Trustees, submitted to the full board and its executive secretary, on behalf of the seven board members who served as a study commit-
tee, a 369–page report entitled "Higher Education in Mississippi." A section of the report entitled "Basic Inequalities in Higher Education

At the time of the U.S. Fifth Circuit Court of Appeals decision in *Meredith v. Fair*, 298 F.2d 696 (5th Cir.1962), the Board of Trustees, contrary to the mandate of *Brown v. Board of Education, supra*, continued to operate a racially dual system of higher education. At least until October, 1962, enrollment at each of the eight public institutions was limited in accordance with the respective historic racial designation, that is, there were no black students attending any of the historically white universities and no white students enrolled at the historically black colleges. (U.S. Exhibit 636, pages 13–14.) The efforts of the members of the Board of Trustees and the officials of the University of Mississippi together with various state officials, including the Governor and Lieutenant Governor of the State of Mississippi, and the Mississippi Legislature to impede and deter efforts to integrate the student body at the University of Mississippi during the 1961–62 school year are well documented. *See, e.g., Meredith v. Fair*, 305 F.2d 341 (5th Cir.1962), *cert. denied*, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66 (1962); *Meredith v. Fair*, 313 F.2d 534 (5th Cir.1962). Black students were not allowed to enroll at a historically white university under the management and control of the Board of Trustees until after the University of Mississippi was required by order of this court in *Meredith v. Fair* to admit and enroll James H. Meredith. The years in which each of the historically white universities first enrolled a black student are as follows:

| | |
|---|---|
| University of Mississippi | 1962 |
| Mississippi State University | 1965 |
| Mississippi University for Women | 1966 |
| University of Southern Mississippi | 1967 |
| Delta State University | 1966 |

The historically black universities first enrolled a white student in the years indicated below:

| | |
|---|---|
| Alcorn State University | 1966 |
| Jackson State University | 1969 |
| Mississippi Valley State University | 1970 |

(U.S. Exhibit 635).

The Board of Trustees' discriminatory policy also encompassed the hiring of faculty and staff at the eight universities. Employment practices followed the historical racial designations at each of the universities. The years in which the eight institutions first employed opposite race, full-time faculty members are as follows:

### Historically White Universities

| | |
|---|---|
| Mississippi University for Women (U.S. Exhibit 232) | 1970–71 |
| University of Mississippi (U.S. Exhibit 234) | 1970–71 |
| University of Southern Mississippi (U.S. Exhibit 236) | 1970–71 |
| Delta State University (U.S. Exhibit 229) | 1973–74 |
| Mississippi State University (U.S. Exhibit 231) | 1974–75 |

### Historically Black Universities

| | |
|---|---|
| Alcorn State University (U.S. Exhibit 228) | 1966–67 |
| Jackson State University (U.S. Exhibit 230) | 1967–68 |
| Mississippi Valley State University (U.S. Exhibit 233) | 1968–69 |

in the State" referred specifically to higher education as follows:

Even greater inequalities exist in the area of higher education. It has been reported earlier that opportunities in this field are limited in the three colleges to undergraduate training in teacher education, in agriculture and the mechanical arts, and in the practical arts and trades; whereas the needs of the white population are served by five colleges, with offerings extending from a variety of undergraduate programs through extensive offerings on the graduate and professional levels. In 1952–53, there were 3,432 students enrolled in all the colleges for Negroes in the state, or 0.3% of the total Negro population; whereas in the colleges and universities for white students, including graduate students, there were enrolled 18,227 students, or 0.9% of the total white population.

. . . .

Of the total of $10,031,539.40 allocated to the institutions for higher education for the period 1952–54, $1,577,175.46 or 15.7% went toward the development of higher education for Negroes.... These data have been utilized to establish the point that, in the past, opportunities for the higher education of Negroes in the state have been far less than those provided for other citizens. It should be recognized, however, that there has been awareness of these inequalities on the part of the Board of Trustees of the state institutions of higher learning and the legislature of the state; and steps have been taken to lessen the gaps. Prior to the recent Supreme Court decision, the legislature adopted a public school equalization program designed to provide the same quality and quantity of education for Negroes as for whites.

Several years after the efforts to integrate the student bodies at each of the eight public universities reached their focal point, the United States Department of Health, Education and Welfare (hereinafter referred to as "HEW") attempted to extract from the State of Mississippi and the Board of Trustees a cohesive plan designed to disestablish the former *de jure* racially segregated system. In response to a March, 1969 HEW letter sent to the state requesting the submission of a desegregation plan to HEW within 120 days, the Board of Trustees submitted a "Plan of Compliance" in 1974. (U.S. Exhibit 1). On September 19, 1974, the Board of Trustees officially instructed the presidents of each university to implement the Plan of Compliance to the best of their abilities within the resources available. (U.S. Exhibit 913.) The Plan of Compliance expressed a basic objective of improving educational opportunities for all citizens emphasizing equal access and the retention of members of minority races to be enrolled and/or employed at all public colleges and universities in Mississippi. The Plan of Compliance made specific projections for opposite race student enrollment at each of the institutions of higher learning from 1973 through 1981 and promised assessment of enrollees and necessary remedial and developmental programs, in order to promote opposite race student retention. Specific projections were made also with respect to faculty and staff hiring for the eight institutions for the years 1974 through 1981. The Plan noted that special efforts would be necessary to comply with the projections for faculty and staff hiring, which comtemplated recruiting qualified undergraduate students, and further noted that additional monies would be sought from the legislature to support this program. As to academic programs, the Plan stressed the importance of desirable programs in attracting students to universities, placed a high priority on strengthening existing programs at the three historically black institutions, and promised priority for such institutions for new programs.

The Plan of Compliance also set forth mechanisms for eliminating the competition experienced by Jackson State University and Alcorn State University posed by the operation of the University Center in Jackson and the University of Southern Mississippi Center at Natchez. The Plan stated that the physical appearance of schools would be closely scrutinized and improvements would be made as funds were made available by the legislature, and further observed that funding had been distributed among the institutions in an equitable manner in the preceding four years, and special legislative appropriations would be sought in order to assist in the implementation of the projections and goals set forth in the Plan of Compliance.

Although HEW's Office of Civil Rights rejected the Board of Trustees' proposed Plan of Compliance for failure to address the separate public junior college system over which the Board possessed no authority, the Board of Trustees adopted the Plan of Compliance and required that each of the institutions under its control adopt policies and procedures designed to implement the goals and projections set forth in the Plan of Compliance. HEW's rejection of the Plan of Compliance precipitated this lawsuit.

## B. Student Admission, Recruitment and Retention

### 1. Admission Requirements and Student Enrollment

The plaintiffs allege that black students are denied equal access to the institutions of higher learning because of the entrance requirements set up by the Board of Trustees.

On February 1, 1961, the Registrar of the University of Mississippi received an application from James H. Meredith, a black male, who sought admission to the 1961 mid-year or spring session, which commenced on February 6, 1961. (U.S. Exhibit 913.) On February 4, 1961, the Registrar informed Meredith that consideration of all pending applications had been discontinued due to alleged "overcrowded conditions." Several days later, on February 7, 1961, the Board of Trustees adopted a policy governing admission to the eight

institutions of higher learning. The new policy required that all students applying for admission to the freshman class of any of the state institutions of higher learning as of September 1, 1961, must take a test or tests prepared by the American College Testing Program (ACT). This policy also addressed acceptance of transfer students, transfers at mid-term, applications containing "false, contradictory, questionable, or uncertain data," and receipt of a "letter of admission" before presenting oneself for registration. (U.S. Exhibit 913.)

On April 20, 1961, the Board of Trustees reaffirmed the alumni voucher requirement adopted in 1954 which required the submission of at least five letters of recommendation as to good moral character from alumni of the institution(s) to which application is made. (U.S. Exhibit 912; U.S. Exhibit 64.) On August 24, 1961, the Board of Trustees adopted a more detailed admission policy. In addition to reiterating the admission requirements promulgated on February 7, this policy: (a) "authorized [each institution] to set a minimum score which applicants to such institution must each make on the American College Test [hereinafter referred to as "ACT"] in order to be eligible for consideration for admission," (b) provided that applications could not be considered "continuing," and (c) stated that applications must include "substantially complete responses made in good faith."

A short time after Meredith was denied admission to the University of Mississippi the Fifth Circuit Court of Appeals in *Meredith v. Fair*, 298 F.2d 696 (5th Cir.), *cert. denied*, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66 (1962), required his immediate admission and struck down the alumni voucher requirement as "a denial of equal protection of the laws, in its application to Negro candidates." *Meredith*, 298 F.2d at 701–02.

In 1963, Mississippi State University, the University of Mississippi, and the University of Southern Mississippi enacted policies requiring all freshman applicants to achieve a minimum composite ACT score of 15. (U.S. Exhibit 913.) Mississippi State University and the University of Southern Mississippi did not admit their first black pupils until 1965 and 1967, respectively.

As of the mid–1970's, the Board of Trustees had not established comprehensive admission standards on a system-wide basis that incorporated either high school achievement or specific ACT requirements. While the Board of Trustees continued to follow its policy of requiring all applicants to take the ACT, each institution was afforded wide latitude in the utilization of the test. Mississippi State University, the University of Mississippi, and the University of Southern Mississippi continued to follow a policy which contemplated achievement of a minimal score of 15 with qualified admission of students failing to achieve this score; Delta State University similarly required a 15 with probationary admission being afforded to students achieving ACT scores of 12, 13, and 14. Mississippi University for Women utilized a regression equation which included the ACT composite score as a component; and Alcorn State University, Jackson State University, and Mississippi Valley State University, while requiring all students to take the ACT, did not require a minimum score for admission. (U.S. Exhibit 039.)

Concerns arose during the 1975–76 academic year with respect to the continued appropriateness of the admission policies and procedures in place at each of Mississippi's public universities. Prompted by complaints voiced by university faculty and staff regarding the low quality and level of preparation of incoming freshmen, the Board of Trustees and its professional staff began to scrutinize the basic reading, writing and computational skills of entering freshmen. The Board of Trustees found that the complaints it had received were bolstered by the tremendous losses in enrollment occurring between the freshman and sophomore years at Alcorn State University, Jackson State University and Mississippi Valley State University which indicated that substantial numbers of incoming students were either not capable of doing college level work or were simply unprepared.

As a consequence, the Board of Trustees staff embarked upon a review of institutional admission practices. The staff found that during academic years 1973–74, 1974–75, and 1975–76 the institutions had admitted students with ACT scores as low as 1 and 2. Alcorn State University, Jackson State University, and Mississippi Valley State University had enrolled significant numbers of students with ACT scores of 9 and below. Moreover, the three major doctoral granting universities had likewise admitted appreciable numbers of students achieving ACT scores below 15. (Board Exhibit 176; Board Exhibit 177.)

The Board of Trustees attempted to address these concerns in May, 1976 by promulgating its first policy establishing minimum ACT scores for college admission to be effective the Fall of 1977. The policy stipulated that no student was to be admitted to any institution as a first-time freshman who failed to achieve an ACT score of 9. This first policy also provided that those institutions presently requiring higher minimum ACT scores were to continue those requirements. (Board Exhibit 179.) High school grades were not adopted as a component of the admission standards.

The admission standards were revised in the succeeding months to allow Mississippi State University, the University of Mississippi, and the University of Southern Mississippi to admit students with scores of 12, 13, and 14 on a probationary basis during the summer session. The policy revision provided that if such students maintained a "C" average during the summer, they were permitted to enroll in the fall semester.

In October, 1977, Dr. Walter Washington, President of Alcorn State University, requested the right to increase admission standards at that institution. Dr. Washington sought and obtained authority for step scale increases first from the 9 ACT test score to 11, then to 13, and it was hoped ultimately to a 15 ACT score by the fall of 1980. Dr. Washington simultaneously obtained, however, the right to admit students scoring 9, which is less than the otherwise applicable ACT minimum, up to a total number of students equal to 10% of the institution's previous year's fall enrollment. (Board Exhibit 179.)

The Board of Trustees again liberalized the admission standards in December, 1977. Responding to discussion that some students scoring below 15 on the ACT may nevertheless be capable of doing college work, the Board authorized Delta State University, Mississippi State University, the University of Mississippi, and the University of Southern Mississippi to go as low as a composite score of 9 in admitting students on an exceptional basis. Such admissions were to be afforded under a "special talents" or "high risk" category.

In response to the continuing concerns of university faculty and staff regarding the quality of enrolling students, the Board of Trustees established in December of 1979 a comprehensive developmental studies program in an effort to improve the classroom performance of students identified as having deficiencies in certain subject matter and to improve retention rates. Low achievers, identified by ACT score, were required to enroll in and pass certain special remedial courses designed and implemented at each of the institutions of higher learning. Those enrolled in the remedial courses would then be permitted to "test out" of the program upon mastery of the courses.

By 1982, it appeared that the ACT minimums coupled with the developmental studies programs in place at each institution were not adequately addressing the problem of academically unprepared students enrolling in and graduating from the universities. As many as one-third of all freshman students were enrolled in remedial courses. At the same time, the Mississippi system of higher education was experiencing substantial budget cuts while expending approximately $1,000,000.00 per year for developmental studies and remedial programs.

In an attempt to positively influence the level of preparation of entering freshmen, the Board of Trustees adopted a policy which required as a prerequisite for admission the successful completion of certain essential academic courses at the high

school level. It was determined that the completion of a "core curriculum" high school course program would raise the level of academic readiness and, when assessed in light of the achievement on the ACT, would provide a reasonable degree of assurance that entering freshmen would be prepared to attempt a university level education. In July, 1982, the Board of Trustees thus adopted a high school college preparatory program known as the "core curriculum" for actual implementation in the Fall of 1986 which consisted of required courses in high school in the sciences, math and English. (Board Exhibit 441.)

In July, 1984, the Board of Trustees approved the request of Dr. James Hefner, President of Jackson State University, to raise the ACT minimum score required for automatic admission to 12, and in February, 1986 the Board of Trustees approved a similar request to raise the standard to 13. Exceptional admissions for students scoring below these minimums were preserved. (U.S. Exhibit 849; U.S. Exhibit 851.)

In April, 1986, Mississippi Valley State University also advised the Board of Trustees of its desire to enhance its image as a quality institution by raising admission standards. The Board of Trustees approved the request of Dr. Joe Boyer, President of Mississippi Valley State University, to raise the minimum ACT score for automatic admission to 13. Dr. Boyer also requested and obtained increased flexibility, that is, 10% of the previous year's total fall enrollment, for the admission of students scoring from 9 to 12. (U.S. Exhibit 852.)

Currently, the principal elements for admission to the state universities include (1) academic achievement in high school, (2) achievement on the ACT, and (3) junior college transfer procedures. All entering freshman students are required to have earned the following high school units in grades 9 through 12 in satisfaction of the core curriculum requirement: English—4 units; mathematics—3 units; sciences—3 units; social sciences—2.5 units; and required elective—1 unit. Deferral and exemption policies do exist, however, which permit student admission without satisfaction of all course requirements on an exceptional basis (such as a particularly high score on the ACT). The core curriculum requirement applies equally to all eight public universities, but the exemption policies are more liberal for the historically black institutions. No student may be admitted to a public university unless he or she satisfies the course requirements or falls under a deferral or exemption category. No particular grade point average is required—receipt of high school credit signifying course completion is all that is necessary. (Board Exhibit 183a, pages 4–6, 9, 12.)

The high school core curriculum and ACT score requirements apply only to the admission of first-time freshmen. Applicants who fail to satisfy either or both requirements may attend other accredited institutions of higher learning. Mississippi has numerous public junior colleges which offer automatic enrollment to high school graduates. Transfer from a junior college to the public universities may be made without satisfaction of the core curriculum or ACT score requirements. These students may transfer after the completion of 24 hours at a junior college with a "C" average. In some instances, students without the requisite ACT score may transfer after satisfactory completion of as few as 15 hours at the junior college level. (Board Exhibit 183a, pages 8–12).

The Board of Trustees currently requires every Mississippi resident applicant under 21 years of age to take the ACT. No student who scores below 9 on the ACT is eligible for admission as a first-time freshman to any of the eight public universities. The minimum test score required for automatic admission varies among the institutions as do the available exceptions for admission of students who fail to achieve the ACT minimum score required for automatic admission.

The Board of Trustees requires a minimum of a 15 ACT composite score for automatic admission to Delta State University, Mississippi State University, Mississippi University for Women, the University of Mississippi and the University of Southern

Mississippi. Exceptions do exist and flexibility is afforded, however, with respect to the minimum score. Each of the above institutions may enroll on an exceptional basis a number not to exceed 5% of the previous academic year's freshman class enrollment or 50 students (whichever is greater) to accommodate talented or high risk students with ACT composite scores of 9 to 14. (Board Exhibit 183a, page 9).

Mississippi University for Women has elected with the approval of the Board of Trustees to implement higher admission standards. Commencing the Fall of 1987, students seeking automatic admission to Mississippi University for Women must submit an ACT composite score of 18 or an ACT composite score of 15, 16 or 17 together with a high school grade point average of 3.0 on a 4.0 scale. Students scoring 15, 16 or 17 on the ACT without achieving a 3.0 grade point average in high school are considered for exceptional admission. No student who scores below 15 on the ACT is eligible for admission as a first-time freshman. (U.S. Exhibit 965, pages 91–99, 121–123.)

Applicants seeking automatic admission to Jackson State University must score a minimum of 13 on the ACT. Again, exceptions do exist and flexibility is afforded with respect to those applicants scoring from 9 to 12 on the ACT. As to these applicants, Jackson State University may enroll a number equivalent to 8% of the previous year's freshman class to accommodate those identified as talented or high risk students. Applicants with 9 to 12 ACT composite score who also have a 3.0 grade point average or who rank in the upper 50% of their high school graduating class are exempt from the 8% exceptional allowance. (Board Exhibit 183a.)

The Board of Trustees requires a minimum composite score of 13 on the ACT for automatic admission to Alcorn State University and Mississippi Valley State University. These institutions are likewise afforded substantial flexibility as to those applicants who score from 9 to 12 on the ACT. Applicants scoring in that range may be admitted but enrollment is limited to a number equivalent to 10% of the previous year's freshman fall term enrollment. (Board Exhibit 183a, pages 10–11.)

### a. The American College Test (ACT)

Because black students on average score lower than white students, the plaintiffs allege that basing admission requirements on ACT scores discriminates unjustly against blacks.

The ACT was developed in the mid-West during the late 1950's as the nation entered into a period of substantial enrollment growth for colleges and universities. Today, every state has at least one institution making some use of the ACT data; the ACT is the predominant admissions test in some 28 states; over 20,000 educational institutions utilize the ACT assessment program; and over 1,000,000 students were tested this past year through the ACT assessment program. (Board Exhibit 162.)

The ACT assesses general educational development on a nationally standardized basis. The test shows at what educational stage the student is at the time of the test—not the innate ability or potential of the students but the present educational development. The test actually consists of a battery of four tests addressing the areas of English, mathematics, social studies, and natural sciences. These four tests measure the developed academic abilities deemed important for success in college. In addition to providing a highly relevant status report on student school achievement, the ACT, as a standardized instrument, enables educators to assess uniformly the level of academic preparation of students graduating from high schools across the state. The ACT further provides information necessary for student placement and serves as a valid predictor of academic performance during the first year of college. (Board Exhibit 162.)

The positive relationship between performance on the ACT and academic achievement during the freshman year at Mississippi universities is well established. The research services offered by ACT as well as the Board of Trustees generated tabular data correlating ACT scores and college grades. Both plainly evidence this

positive relationship. (U.S. Exhibit 946, pages 32–40; U.S. Exhibit 967, pages 75–78; Board Exhibit 275.)

Average ACT scores do differ among Mississippi black students as contrasted with Mississippi white students. Black students on the average score somewhat lower. Yet, this is not a Mississippi phenomenon but rather a national pattern. Scores on the ACT correlate with the socio-economic status of the student. It is not as much a racial correlation as an economic one. Dr. Thomas Satterfield, Deputy Superintendent of Education, State of Mississippi, testified that as more students, black and white, choose to take the core curriculum now offered by high schools in the state, the ACT score rises measurably. The studies have shown that fewer black students on a percentage basis choose to take the core curriculum than do whites, but as more blacks choose to take the curriculum, their scores are also higher than blacks and whites who choose not to take it.

Differential scores can also be found according to the sex, age, and family income of students tested. (Board Exhibit 172, pages 3, 10; U.S. Exhibit 874, pages 7–8.) Nationally, 95% of all ACT-tested students score 9 or above and over 70% of all students score 15 or above. (U.S. Exhibit 874, page 9.) Nine out of every ten ACT-tested students in Mississippi, including 80% of all black students, score 9 or above on the ACT; and students who achieve a 9 on the ACT English and social studies test are only reading at a ninth grade level. (Board Exhibit 190, pages 5–10.) Students scoring a 15 on the ACT are themselves only on the verge of a freshman reading level. (Board Exhibit 190, pages 5–10.) Thus, the Board-established minimum ACT scores are extremely modest levels of required performance. Indeed, a United States expert characterized scores of 10 and 11 as "drastically low" and certainly not reflective of a level of academic achievement for college work. (Board Exhibit 463, pages 160–61.)

Very few black students, if any, are actually denied admission to a Mississippi university as a first-time freshman for failure to achieve the minimal ACT score. Alcorn State University, Jackson State University, and Mississippi Valley State University did not deny admission to a single applicant for the fall of 1986 who scored 9 or above on the ACT. (U.S. Exhibit 960, pages 109–10.) Similarly, Mississippi State University did not deny admission to a single applicant scoring above 11 on the ACT and the University of Mississippi denied admission to only nine black freshman applicants who completed an application for admission. (U.S. Exhibit 964, pages 140, 144–45.) The University of Southern Mississippi has not admitted its full quota of students who score below 15 on the ACT in recent years due to an insufficient number of applicants in that category.

The admission standards now in place are more modest than the National College Athletic Association Proposition 48, the much publicized policy for college student athletes. The NCAA admissions policy requires achievement of specified ACT composite scores in order for student athletes to be eligible to participate in athletics. In 1986, student athletes could score as low as 13 and participate in athletics; in 1987, they may score as low as 14; but beginning in August of 1988, all student athletes must achieve an ACT composite score of 15 and at least a 2.0 grade point average on a 4.0 scale. Unlike the Board of Trustees' standards, there are no exceptions to this 15 requirement. Moreover, the current Board of Trustees policy does not require students to achieve a 2.0 grade point average.

The Board's prescribed pre-college curriculum is an appropriate measure of academic progress and achievement in high school. (U.S. Exhibit 970, pages 49–54.) There is substantial evidence that the completion of the high school course requirements has resulted in a higher level of academic preparation for those students wishing to experience the rigors of academic life at the university level. Since the implementation of the high school "core curriculum," the necessity for developmental education in college has declined significantly and ACT scores have improved dramatically. (Board Exhibit 167, pages 8–9.)

The mean ACT score in 1986 for black students who completed the high school college preparatory core curriculum was 14.3 while the mean score for those students not completing the core curriculum was only 10.8. (Board Exhibit 170.)

The modesty and reasonableness of the ACT score requirements for automatic admission are reinforced by the substantial flexibility afforded through exceptions to these minimum scores. (U.S. Exhibit 970, pages 58–59.) Each institution takes into account educational criteria in addition to ACT scores and high school courses completed in evaluating whether an applicant who has scored below the ACT threshold for automatic admission should be admitted. Grades, class rank, extracurricular activities, special talents, and recommendations of teachers and counselors are considered in attempting to identify students with reasonable prospects for academic success in college. (U.S. Exhibit 967, pages 66–71; U.S. Exhibit 961, pages 143–44; U.S. Exhibit 962, pages 145–51.)

### b. Admission from Junior Colleges

Under the present policies, no applicant for first-time freshman admission to a public university is denied the opportunity to obtain a university degree for failure to achieve a particular ACT score, including the floor requirement of 9. At most, admission is deferred. Students may attend a public junior college, all of which have open admission policies, and then transfer to a senior college after successful completion of as few as 15 hours. (Board Exhibit 183A, page 8.) This procedure is not unreasonable or unduly burdensome. Indeed, thousands of students elect to attend junior colleges in Mississippi (Board Exhibit 185), and substantial numbers of these students subsequently transfer to public universities (U.S. Exhibit 965, pages 111–12, 117; U.S. Exhibit 001, page 27). In 1986, 60% of all the college students in Mississippi were enrolled in the junior colleges.

The defendants argue that the ACT requirements currently in use are reasonable and constitutional and that medical, law and engineering hopefuls should be held to at least as high admission standards as the NCAA requires of tight ends.

### 2. Student Recruitment

Although all eight universities have admitted "other-race" students since the 1960's (see pp. 16–17), nevertheless the historically black institutions are still predominantly black and the historically white institutions are still predominantly white. The question before the court is whether the racial identities of these universities is a result of the present free choice of the students or of official state policies and practices to promote the continued historical racial identity of each university.

Those individuals at each of the institutions with responsibility for student recruitment are responsible for recruiting other-race students as well. In addition, universities employ other-race recruiters charged with specific responsibility for the recruitment of other-race students. Other-race students, faculty, and alumni participate in the institution's recruitment efforts. Multi-racial recruiting teams are frequently used. (Board Exhibit 105, page 5; Board Exhibit 069, page 5; Board Exhibit 044, pages 6–7; Board Exhibit 129, page 18.) The universities also make use of various recruitment brochures and other university publications which have an other-race emphasis and which seek to convey the institution's commitment to other-race participation. (Board Exhibit 129, page 18; Board Exhibit 069, page 5, appendix; Board Exhibit 044, page 7; U.S. Exhibit 867, page 15; U.S. Exhibit 962, pages 19–20.) The universities also utilize news releases, promotional radio spots, public service announcements, newspaper advertisements, and slide presentations emphasizing other-race participation in university life. (Board Exhibit 033, page 4; Board Exhibit 046, page 12; Board Exhibit 071, page 3; Board Exhibit 077, page 8; U.S. Exhibit 962, page 19.)

Each of the universities initiates and maintains numerous contacts with high schools and junior colleges in their recruiting efforts. Each university strives to recruit at as many high schools and junior colleges as possible, including schools with

substantial other-race enrollment. (Board Exhibit 021 through Board Exhibit 129.) High school counselors are informed of activities of special interest to minorities (Board Exhibit 129, page 18) and campus minority recruitment conferences in which minority students and counselors are asked to make campus visits. (Board Exhibit 105, page 6; U.S. Exhibit 867, page 15.) The Board of Trustees does not permit the universities to recruit at schools which fail to execute an agreement to allow multi-racial recruiting teams. (Board Exhibit 102, page 5; U.S. Exhibit 962, page 27; U.S. Exhibit 001, page 6).

The recruitment of minority students appears to be a competitive business; both the historically white institutions and the historically black institutions continually strive to increase enrollment of other-race students. Recruitment efforts have resulted in the representation of blacks in the freshman classes at Delta State University, Mississippi State University, Mississippi University for Women, and the University of Southern Mississippi in statistical parity with the representation of blacks in the qualified applicant pools. Qualified blacks and qualified whites are equally likely to apply, be accepted, and enroll at these universities. (Board Exhibit 192; Board Exhibit 193.) Black students who choose to enroll at a historically white university appear to perform well and are well received. Dr. James McComas, President of the University of Southern Mississippi, the second largest of the eight institutions, testified that a larger percentage of the black students who return as sophomores after their freshman year go on to graduate on time than do the same category of white students. Black students at the University of Southern Mississippi have been elected Homecoming Queen, Mr. University of Southern Mississippi, and to the Hall of Fame.

### C. Faculty Recruitment

The statistical presence of other-race faculty at the historically black institutions is substantial and unchallenged. Approximately 32% of Alcorn State University's faculty is white, at Jackson State University 33% of the faculty is white, and at Mississippi Valley State University approximately 26% of its faculty is white. (U.S. Exhibit 742a; U.S. Exhibit 742c; U.S. Exhibit 742(f).) The defendant universities recruit and hire faculty on a nationwide basis. (U.S. Exhibit 946, page 122; U.S. Exhibit 969, pages 12–13; U.S. Exhibit 963, page 20.) The historically white institutions expend substantial affirmative efforts in an attempt to attract and employ other-race faculty, including (1) publication of position availability in the *Chronical of Higher Education,* as well as in publications specifically addressing minority interests, such as the *Affirmative Action Register, Equal Opportunity Forum,* and *The Black Scholar* (U.S. Exhibit 969, page 14; U.S. Exhibit 946, page 114; U.S. Exhibit 758), (2) publication of position availability in the specific discipline periodicals for which there is an open position (U.S. Exhibit 959, page 13), (3) mailings to and distribution of vacancy notices among the institutions of higher learning, (4) announcements placed with regional and national meetings of disciplines in which openings exist (U.S. Exhibit 758), (5) establishment of distinguished professorships, employment of visiting professors, and presentation of black guest lecturers and visiting scholars (Board Exhibit 041, page 18; Board Exhibit 104, pages 27, 32), (6) special funds allocated to minorities for salary incentives, supplementation, and support (U.S. Exhibit 946, page 115), and (7) organizing and funding committees specifically responsible for minority recruitment (Board Exhibit 104, page 26).

Recruitment of minority faculty is severely hampered by the acute shortage of supply of minority individuals having the requisite qualifications. For example, from 1977 to 1982, out of 1,067 Ph.D's awarded in chemical engineering in the United States, only 6 or less than 1% were awarded to blacks; out of 1,679 Ph.D's awarded in electrical engineering, only 29 or less than 2% were awarded to blacks; and in European history, a field included within the social sciences where blacks are generally best represented, out of 1,165 Ph.D's awarded, only 6 or less than 1%

were awarded to blacks. Moreover, business and industry keenly compete with educational institutions for the extremely limited number of blacks who hold terminal degrees. Further, the push to employ more minority faculty is a nationwide issue. Institutions throughout the country are competing for the same limited supply and finding it extremely difficult to increase the percentage of other-race faculty. Mississippi universities are at a distinct competitive disadvantage in attempting to attract, employ, and retain qualified black faculty members. Due to Mississippi's difficulties in funding higher education, faculty salaries are not competitive with many larger universities; faculty salaries tend to be several thousand dollars below national averages; and salary increases for faculty have been proportionately lower than in surrounding states where the higher education dollar is not spread among so many institutions with duplicate programs. Noncompetitive salaries are significant with respect to the recruitment of minority faculty due to the limited supply and great demand for minority faculty throughout the country which affords the black faculty member substantial leverage in financial negotiations.

The high demand for black faculty makes it difficult to retain those who are hired. Institutions outside Mississippi are frequently able to lure black faculty away with more financially attractive opportunities after the teachers have gained needed experience in Mississippi institutions. (U.S. Exhibit 969, page 10; U.S. Exhibit 963, pages 22–23.)

Since 1974, the percentage of blacks hired by Mississippi universities exceeded the black representation in the qualified labor pool. There were some 53 more blacks hired in faculty positions than one would have expected given the representation of blacks in the qualified labor pool, and this pattern holds at each of the five historically white institutions. (Board Exhibit 430; Board Exhibit 214 through Board Exhibit 217; Board Exhibit 431.) Moreover, even though the turnover rate for black faculty is higher than for whites, the representation of blacks among the faculty at each of the five historically white institutions is statistically in line with the relevant labor market for faculty employment since 1974. (Board Exhibit 207 through Board Exhibit 212.)

### D. Institutional Mission & Academic Programs

#### 1. Program Offerings and the Assignment of Institutional Missions

The plaintiffs have alleged that segregation has been perpetuated by the Board assigning the historically white universities more comprehensive undergraduate and graduate programs offering doctoral degrees than assigned to the black universities, thus discouraging white students from attending black universities.

As stated above, at the time the Board of Trustees issued the Brewton Report in 1954, higher education opportunities for blacks in the State of Mississippi were limited to the three black colleges which offered undergraduate training in the areas of teacher education, agriculture, mechanical arts, and the practical arts and trades. The white population was served by five colleges, which offered a variety of undergraduate programs complemented by extensive offerings on the graduate and professional levels. (U.S. Exhibit 29, page 148.) By the mid–1960's all five of the historically white institutions offered graduate work. Jackson State University was the only historically black institution that offered graduate work. (U.S. Exhibit 29.)

From 1967 through 1984, Jackson State University experienced a tremendous period of growth in both the number and types of academic programs offered. Academic programs were established in such fields as industrial technology, computer science, mass communications and meteorology. Five schools—the School of Business and Economics, the School of Education, the School of Liberal Studies, the School of Science and Technology and the Graduate School—were established. The Graduate School grew from a single master's degree in school administration to 35 master's degrees, 15 specialist's degrees and a doctorate in early childhood education. Accredi-

tations grew from regional accreditation by the Southern Association of Colleges and Schools to numerous national professional accreditations in such areas as teacher education, industrial technology, rehabilitation education, chemistry, social work, art design, music and public affairs and administration. (Board Exhibit 463, pages 108–09).

By 1981, the three comprehensive historically white institutions (Mississippi State University, the University of Mississippi and the University of Southern Mississippi) offered more programs than the three historically black institutions. There was comparability, however, in the number of program offerings between the regional universities of Alcorn State University and Mississippi Valley State University on the one hand and the two remaining historically white institutions, Delta State University and Mississippi University for Women. No historically black institution then and now offers a professional degree in programs such as law, medicine, dentistry, or pharmacy. (U.S. Exhibit 682.) Jackson State University is the only historically black institution that offers degree programs above the specialist level. (U.S. Exhibit 684.)

As a consequence of the 1974 Plan of Compliance and in conjunction with the academic program review process commenced in 1980, the Board of Trustees in 1981 attempted to define the role and scope of its eight public universities in a document entitled "Mission Statements." (Board Exhibit 274). The document presented a trichotomous classification scheme labeling each institution either "comprehensive," "urban," or "regional." It is common within higher education practices to classify universities according to "mission"—a term synonymous with "role and scope." Such classifications are generally based on the number and level of degree programs offered by an institution, the fields in which degrees are granted, the extent to which an institution conducts and receives funding for research, and areas of public service responsibility. The assignment of missions among institutions of higher learning is in fact necessitated by limited financial resources in the higher education budgets.

All institutions cannot offer terminal degrees in all fields. Missions and special fields of excellence must be assigned.

Dr. James Millett, former President of the University of Miami (Ohio) and Chancellor of the Ohio Board of Regents, testified that every state Board struggles with the task of assigning missions to its universities—that is, every state save one. Wyoming has no such problem because it has only one state university. Dr. Millett testified, and the court so finds, that the missions assigned to the regional black colleges and the regional white colleges should depend on the financial resources of the state. According to Dr. Millett, some black students feel more comfortable and the cultural and social atmosphere for education is better for some at black colleges than at large, comprehensive universities; and that, therefore, black colleges do have a place so long as blacks also have equal access to the large, comprehensive universities and the state has sufficient funds to maintain the black colleges and their duplicating, overlapping programs of higher education.

The Board of Trustees thus designated Mississippi State University, the University of Mississippi and the University of Southern Mississippi as "comprehensive" universities which implied that these institutions offered the greater number and higher level of degree programs than did the remaining institutions. The comprehensive designation also implied that each institution was expected to offer a number of programs on the doctoral level but not in the same disciplines. Leadership responsibilities in specific disciplines have been assigned to each comprehensive university in order to promote program quality and the efficient utilization of limited resources. (Board Exhibit 274; U.S. Exhibit 683, pages 3–8.)

As the only university designated as an "urban" university, Jackson State University's role has been defined as one oriented toward service of the urban community, that is, the City of Jackson. Its mission is to instruct in research and public service with particular emphasis on the needs of

the urban community in which it is located. (Board Exhibit 274.) In 1981, and at the present time, the number and level of programs offered at Jackson State University were, and are, significantly greater than the average offered at the "regional" Mississippi institutions, Delta State University and Mississippi University for Women, but less than that offered at the "comprehensive" institutions.

Alcorn State University, Delta State University, Mississippi University for Women and Mississippi Valley State University have received the designation of "regional" universities. The "regional" designation signifies a more limited programmatic focus for these institutions, that is, each is expected to restrict course offerings to quality undergraduate instruction. Apart from Alcorn State University's land grant activities, research and public service responsibilities are to be limited. (Board Exhibit 274; U.S. Exhibit 683, pages 10–12).

### 2. Program Reduction and Program Duplication

In 1980, all programs below the doctoral level except certain professional programs were subjected to an intensive six-year review. (Board Exhibit 263, chapter 1 and 2.) Implementation of the review process included: (1) an exhaustive review by the Board's staff of the program review literature and instruments utilized in previous program reviews conducted across the nation; (2) compilation of review documents covering the scope of prospective reviews; (3) pilot review of a selected few programs to test the process; (4) following pilot review, documentation of operational procedures for the review (Board Exhibit 266); (5) employment of professional consultants to review each program; and (6) uniform utilization of data-gathering instruments addressing such factors as program need, program demand, student enrollment, courses taught, faculty qualifications, degree requirements, degrees awarded, employment of graduates, program relationship to institutional mission, and program costs (Board Exhibit 268; Board Exhibit 269).

As a result of this review process, the Board ordered a substantial decrease in the number of programs, across degree levels at both the historically black and the historically white institutions. The average number of programs offered at the historically white institutions decreased from 77 to 52 at the bachelor's level, 47 to 32 at the master's level, 9 to 4 at the specialist's level, and 12 to 11 at the doctoral level. With respect to the historically black institutions, the average number of programs decreased from 42 to 29 at the bachelor's level, 12 to 10 at the master's level, and 4 to 3 at the specialist's level. Overall, a total of 43 programs were eliminated at the three historically black institutions between 1981 and 1986 and a total of 227 programs were eliminated at the five historically white institutions over the same time period. (U.S. Exhibit 685, page 87; U.S. Exhibit 685(v).)

The program reductions also had the effect of reducing the amount of program duplication which had existed within the Mississippi system of higher education prior to 1981. As of 1986, however, program duplication persisted. Program duplication refers to those instances in which broadly similar programs are offered at more than one institution. A program is defined as necessarily duplicated if the presence of that program is essential for the provision of general education or specialized education in the basic liberal arts and sciences at the baccalaureate level. Program duplication and necessary duplication refer to the core programs, that is, programs that are considered to be essential. Unnecessary duplication refers to those instances where two or more institutions offer the same nonessential or noncore program. Under this definition, all duplication at the bachelor's level of nonbasic liberal arts and sciences course work and all duplication at the master's level and above are considered to be unnecessary.

In assessing the amount of unnecessary program duplication existing within the Mississippi system of higher education today based upon a comparison of the historically black institutions and the historically

white institutions, disregarding institutional mission and demand for programs, it is found that at the bachelor's level, 34.6% of the 29 programs offered at the historically black institutions are unnecessarily duplicated by the historically white institutions. At the master's level, 9 of the 10 programs (or 90%) offered at the historically black institutions are unnecessarily duplicated at the historically white institutions. There also exists a substantial degree of unnecessary program duplication at the specialist level between the historically black and historically white institutions. (U.S. Exhibit 685(f)(g).) The historically white institutions as a group have lower percentages of duplication than the historically black institutions since the historically white institutions offer more programs than are offered at the black institutions. (U.S. Exhibit 685, page 11; U.S. Exhibit 685(c).)

Assessing the amount of unnecessary program duplication existing between the comprehensive versus noncomprehensive universities without consideration of the historical racial designation of the institutions, the court finds that at the bachelor's level 39.1% of all courses offered at the noncomprehensive universities are duplicated or also offered at the comprehensive universities. At the master's level, 87.9% of the programs offered at the noncomprehensive universities are also offered at the comprehensive universities.

Considering the amount of unnecessary program duplication existing between the comprehensive universities versus the historically black and the historically white noncomprehensive universities, the court finds that 32.7% of the programs offered by the historically black universities at the bachelor's level are unnecessarily duplicated by the comprehensive universities. At the master's level, 86.2% of the programs offered by the historically black universities are unnecessarily duplicated by the comprehensive universities. On the other hand, 48.9% of the programs offered by the historically white noncomprehensive universities at the bachelor's level are unnecessarily duplicated by the comprehensive universities. At the master's level, 92.9% of the programs offered by the historically white noncomprehensive universities are unnecessarily duplicated by the comprehensive universities. Thus, a higher percentage of unnecessary program duplication exists between the historically white noncomprehensive universities vis-a-vis the comprehensive universities than exists between the historically black universities and the comprehensive universities. (Board Exhibit 262.) Needless to say, this large amount of unnecessary duplication of programs at institutions which in some cases are less than 50 miles apart in sparsely populated areas is not a model of economic efficiency. For example, the unnecessary duplication of programs and administrations by two noncomprehensive universities, Delta State and Mississippi Valley State, only 35 miles apart in the rural, financially strapped Mississippi Delta, cannot be justified economically or in terms of providing quality education; and the unnecessary duplication by Mississippi State University and Mississippi University for Women, only 20 miles apart in the eastern hill section of the state, cannot be justified on an economic or efficiency basis; however, this case is not about the efficiency or the economic wisdom of higher education policies. It is about the charge of racial discrimination in higher education.

With respect to the relative quality and quantity of programs offered, library volumes, and number of faculty with doctorates and degrees from major research institutions, differences do exist among the institutions. However, these differences do not appear to be associated with traditional institutional racial designations but simply correlate with whether an institution is comprehensive or noncomprehensive. Furthermore, there is no pattern in program quality among the noncomprehensive universities with respect to race. (Board Exhibit 205; Board Exhibit 206; Board Exhibits 224–228; Board Exhibit 238; Board Exhibit 241; Board Exhibit 244; Board Exhibit 247; Board Exhibits 258–261.)

### 3. Off Campus Program Offerings

The plaintiffs charge that the Black universities are kept in a secondary, segregated class by the off-campus centers set up

by comprehensive universities near the campuses of the black universities, thus discouraging whites in the area from enrolling in the black institutions.

### a. The University Center at Jackson

On February, 1951, the Board of Trustees approved the establishment by the University of Mississippi, in cooperation with Millsaps College, a private institution, of an off-campus center on the Millsaps campus in Jackson, Mississippi, the location of Jackson State University. Beginning in the Summer of 1951, the University of Mississippi offered credit and noncredit adult evening courses at the Millsaps Center. Enrollment at the Center during the period 1956 through 1966 ranged from a high of 975 in Fall, 1958 to a low of 284 in Fall, 1962. (U.S. Exhibit 913, stipulations 1, 2, 6.)

In April, 1961, the Board of Trustees authorized Mississippi State University to establish a resident center at Belhaven College, a private Presbyterian college in Jackson, Mississippi. During the 1964–65 academic year, 86 courses were offered and enrollment reached 960 at the Belhaven Center. In the Fall of 1964, the University of Southern Mississippi also began offering courses in cooperation with Mississippi State University at the Belhaven Center. (U.S. Exhibit 913, stipulations 8, 9, 12, 13.)

In May, 1964, the Executive Secretary of the Board of Trustees and the Director submitted to the Board of Trustees for its approval an agreement signed by officials of the University of Mississippi, Mississippi State University and the University of Southern Mississippi to establish a cooperative center in Jackson, offering an improved program of continuing education for residents of the immediate area. (Private Plaintiffs Exhibit 367, stipulation 17.) In December, 1966, the consolidation of the three Jackson extension centers was authorized by the Board of Trustees and early the next year the Mississippi University Center in Jackson was established and was to be operated jointly by the three universities. The establishment of the University Center constituted a merger of the Jackson resident centers previously operated by the three universities. The granting of degrees at the University Center was not authorized at that time. (U.S. Exhibit 913, stipulation 21).

On May 18, 1972, the Board of Trustees voted to assign management responsibilities for the University Center to Mississippi State University, the University of Mississippi and Jackson State University. On September 21 of the same year the University Center was given degree-granting status. The plaintiffs alleged that the operation of this center near Jackson State University competes with Jackson State and tends to perpetuate the alleged segregated system. The Plan of Compliance of May, 1974, proposed to diminish the competition between Jackson State University and the programs offered by the historically white universities at the University Center. At present, Jackson State University enjoys on-campus privileges at the University Center and retains veto authority over all programs offered at the Center by the remaining institutions. Only limited graduate and unique offerings of the historically white institutions remain.

### b. The Natchez Center

The University of Southern Mississippi's request to establish a resident center in Natchez, Mississippi, near Alcorn State University, was approved by the Board of Trustees on June 21, 1962. The Natchez Center enrolled its first students in the Fall of 1962. The curriculum was designed to offer adult students three years of undergraduate work at Natchez and contemplated a final year of studies—either at the main campus in Hattiesburg or at any other Mississippi University upon transfer. During the Fall term of 1962, there were 198 students attending 14 classes at the Natchez Center. The Center is located approximately 40 miles from Alcorn State University. (U.S. Exhibit 912, stipulation 206; U.S. Exhibit 913, stipulation 204.)

The Board of Trustees subsequently assigned the management responsibility for the Natchez Center to the University of Southern Mississippi and approved the granting of baccalaureate degrees at the Center in the fields of elementary and sec-

ondary education and business administration—all of which were offered by Alcorn State University. The Board of Trustees, in 1972, instructed the presidents of the University of Southern Mississippi and Alcorn State University to meet and "establish the procedures whereby Alcorn [State University] will participate significantly in the instructional programs of the branch campus in Natchez." (U.S. Exhibit 913, stipulation 223.) The Plan of Compliance called for the joint participation of the two universities at the Natchez Center, making specific provision that Alcorn State University would teach 25% of the baccalaureate and master's degree courses offered at the Center. (U.S. Exhibit 913, stipulation 366.)

On February 17, 1977, the Board of Trustees transferred all responsibilities of the nursing program then offered by the University of Southern Mississippi at the Natchez Center to Alcorn State University. At present, the University of Southern Mississippi offers only noncredit extension courses at the Natchez Center.

### c. The Vicksburg Resident Center

The Mississippi State University extension programs located at Vicksburg, Mississippi were recognized by the Board of Trustees as a resident center in May of 1952. (U.S. Exhibit 912, stipulation 733.) Prior to 1972, Mississippi State University offered extension classes at the Vicksburg Center as part of an in-service training program for Vicksburg public school employees. In October, 1979, Alcorn State University was authorized by the Board of Trustees to offer several courses at the Vicksburg Center. (U.S. Exhibit 912, stipulation 739.) The next year a consortium arrangement between the two schools was approved. (U.S. Exhibit 912, stipulation 737.) During the 1984–85 school year, 19 students were enrolled at the Vicksburg Resident Center, and 48 were enrolled in the center's engineering program. (U.S. Exhibit 914, page 15.)

### E. Mississippi State University and Alcorn State University

#### The Land Grant Activities

Allegations were made by the plaintiffs that the state discriminatorily on the basis of race deprives Alcorn State University of funds and support in favor of Mississippi State University. Both of these institutions are land grant institutions. A land grant institution is defined as a college university entitled to financial and programmatic support from the federal government pursuant to a series of statutes originating with the Morrill Acts enacted by Congress in 1862 and 1890. The Morrill Act of 1862 allowed states to either sell federal land equal to 30,000 acres and place the proceeds into an endowment, or to receive scrip in lieu of land. The colleges so set up were to teach agricultural and mechanical arts, in addition to the traditional courses of study. The next major piece of legislation, entitled the Hatch–George Act, passed by Congress in 1887, referencing the Morrill–Wade Act, authorized the appropriation of funds to support agricultural research. In 1914, Congress passed the Smith–Lever Cooperative Extension Act, providing for agricultural extension for farmers. These three congressional acts defined the land grant college to be an institution that provides instruction in agriculture and mechanical arts, research in agriculture through the experimental stations, and extension of knowledge to farmers through cooperative extension programs. In 1890, Congress passed the second Morrill Act which allowed states at their discretion to designate institutions to provide educational opportunities for blacks in agriculture.

Like many states, Mississippi has two land grant universities. Mississippi State University, established in 1878, as an agricultural mechanical arts college, has, since its inception, served as the institution designated by the state to receive federal funds pursuant to the first Morrill Act. Alcorn State University serves as the state's 1890 institution, that is, the land grant institution designated by the state to receive funds pursuant to the second Morrill Act.

In 1888, the state accepted the provisions of the 1887 Hatch Experimental Station Act and gave Mississippi State University the authority to receive and expend such

funds. Alcorn State University was given no powers relative to the Hatch Act even though the congressional enabling legislation did not limit the state to granting this power only to Mississippi State University, but allowed for the inclusion of Alcorn State University. (U.S. Exhibit 913; U.S. Exhibit 695(a), page 2.) In 1916, the Mississippi Legislature accepted the provisions of the Smith–Lever Cooperative Extension Act of 1914 and gave Mississippi State University the exclusive authority to receive and expend such funds. (U.S. Exhibit 912.) The State of Mississippi was not required by the federal enabling legislation to allocate this function equally to the 1862 and 1890 institutions. One year later, the experimental station and cooperative extension programs were placed under the administrative control of Mississippi State University. (U.S. Exhibit 695(a), page 3.) In 1942, Mississippi State University was authorized to acquire land through the experimental station that was later renamed the Mississippi Agricultural and Forestry Experimental Station (hereinafter referred to as "MAFES"). It was not until 1972 that Alcorn State University was authorized by state legislation to conduct a branch experimental station at Alcorn. (U.S. Exhibit 695(a), pages 4–5.) The Alcorn Branch Experiment Station is funded by the State of Mississippi through MAFES. The Alcorn Branch Experiment Station is an organizational unit of MAFES which is in turn an organizational unit of Mississippi State University.

## 1. Instruction

Consistent with congressional directives, federal support for instruction in agriculture, while limited, is and has been equally divided between Alcorn State University and Mississippi State University. The state funds for instruction are allocated by the Board of Trustees according to a funding formula. The court finds that the state funding for instruction in agriculture is based on objective educational criteria, and that the financial allocations to Alcorn State University and Mississippi State University are educationally sound and reasonable and not affected by racial considerations.

## 2. Research

The state's program of agricultural research is heavily concentrated at Mississippi State University. The genesis of this agricultural research activity was the Hatch Act of 1887, which provided for the creation of agricultural experiment stations in connection with the first Morrill Act colleges. Since 1888, by state statute and with federal concurrence, Hatch Act funds received by the state have been assigned to Mississippi State University for support of the state's experiment station. *See* Miss. Code Ann. § 37–113–17 (1972). The McIntyre–Stennis Act of October 10, 1962 (16 U.S.C. § 582a, *et seq.*) provided for a program of forestry research at agricultural experiment stations established under the first Morrill Act and the Hatch Act. Hatch Act funds, McIntyre–Stennis Act funds, and state matching funds are expended and accounted for by MAFES. MAFES, charged by federal and state policies to discover new knowledge for public benefit, is an integral part of Mississippi State University and yet is a separately funded entity. MAFES is funded at the state level by direct legislative appropriation and not by Board of Trustees allocation of general funds for higher education.

The United States Department of Agriculture (USDA), through its Cooperative State Research Service Division (CSRS), oversees the state research program. Federal appropriations are administered by CSRS which provides direction and control to state experiment stations throughout the country, administers research on a regional basis, and oversees a national system of agricultural research. No evidence was offered to suggest any discriminatory purpose, intent or effect in connection with Mississippi's role in agricultural research. For many years, MAFES has had a working relationship with faculty and administration in agriculture at Alcorn State University. Beginning in the late 1960's and formalized in 1971, MAFES and Alcorn State University joined in an effort resulting in the creation of the Alcorn Branch of MAFES. This was "forward" legislation serving as a model for other states.

Prior to 1967 the role of 1890 institutions was principally the teaching of agriculture and related subjects. In 1967 some limited research funds were earmarked by Congress for such institutions; these appropriations were increased in 1972 and were appropriated directly to the 1890 institutions under the 1977 Farm Bill (7 U.S.C. § 3101, *et seq.*). Section 1445 of the Farm Bill appropriated funds for agricultural research at 1890 colleges and simultaneously required the director of the state agricultural experiment stations and the research director of the 1890 institutions to jointly develop a comprehensive program of agricultural research for the state. Pursuant to this directive, MAFES and Alcorn State University jointly coordinated the development of a state-wide comprehensive program; Alcorn State University also conducts its own research program and conducts research through its participation in the Alcorn Branch of MAFES. All officials directly involved in experimental station programs in Mississippi characterize the relationship between Mississippi State University and Alcorn State University as excellent. Alcorn State University has received limited state legislative appropriations for agricultural research since 1971.

### 3. Cooperative Extension

Cooperative extension is a cooperative venture among the USDA, land grant colleges, and county government, jointly financed by Congress, state legislatures, and county governments. Cooperative extension began with the Smith–Lever Act of May 8, 1914 (7 U.S.C. § 341, *et seq.*) and now encompasses four areas: agricultural and national resources programs; home economics or family living; 4–H youth development; and community development. The purpose of state cooperative extension is to help farm families improve their farm operations, to help farm-related businesses improve their operations, to help individuals gain knowledge to improve family living, and to improve rural community life. Since 1916, by state statute and with federal concurrence, Smith–Lever funds received by the state have been assigned to Mississippi State University. *See* Miss.Code Ann. § 37–113–19 (1972). The Mississippi Coop-

erative Extension Service (hereinafter referred to as "MCES"), an off-campus educational arm of Mississippi State University and separately funded by federal, state, and county governments, is the entity administering the Mississippi extension program. *See generally Wade v. Mississippi Cooperative Extension Service,* 372 F.Supp. 126 (N.D.Miss.1974). MCES is funded at the state level by direct legislative appropriation and not by Board of Trustees allocation of general funds for higher education.

The Extension Service of the USDA administers direction and control for the state program, including detailed plans of work and financial reports. No evidence was offered to suggest any discriminatory purpose, intent or effect in connection with the state's role in cooperative extension work, that is, that access to cooperative extension programs is in any way influenced by racial considerations.

For many years, MCES has operated a branch at Alcorn State University. Beginning in 1970, Congress earmarked extension funds specifically for 1890 institutions, and under the 1977 Farm Bill certain federal funds were appropriated directly to those institutions. Section 1444 of the Farm Bill appropriated funds to 1890 colleges for extension, stipulating that the work to be carried out would be submitted as part of the State Plan of Work, and Congress directed that the state director of the cooperative extension service and the extension administrator of the 1890 institution jointly develop a comprehensive program of extension for the state. This in fact occurs between MCES and Alcorn State University with the result that, with MCES cooperation, Alcorn State University conducts its own extension work serving small-scale farmers in 13 counties and participates in the development of the state-wide comprehensive program. The Extension Service insures that the MCES and Alcorn State University extension programs are supplementary to one another rather than duplicative. Alcorn State University receives limited state legislative ap-

propriations for cooperative extension work.

### F. Funding of the Eight Universities

The plaintiffs allege in this suit that the black citizens are deprived of equal protection of the law because of discriminatory funding of the eight universities which favors the traditionally white universities over the traditionally black universities. State funding for general support of the basic educational and operating activities of the eight universities is provided in the form of an annual lump sum appropriation to the Board of Trustees. It is the Board of Trustees' responsibility to allocate the general support appropriation among the respective institutions. Miss.Code Ann. § 37–101–15 (1972). The general support appropriation does not include funds for capital improvements, the Mississippi Agricultural and Forestry Experiment Station, or the Mississippi Cooperative Extension Service.

The Board of Trustees employs a budgeting equation referred to as the "funding formula" as the primary basis for determining the level of support for each university. Instruction-based, the Mississippi formula is tied to the educational activities of the universities. Such funding formulas are commonly used in higher education throughout the nation. The Board of Trustees has utilized the present instruction-based model since 1974.

Budgetary allocations to each university are based on the number of the previous year's student credit hours multiplied by the dollar rate per student credit hour with allowances made as to the field and level of study and mission of the institution. This figure, referred to as "investment in instruction," is deemed to be a specified percentage of an institution's total educational and general need with this percentage varying according to the mission of the institution. Following calculation of investment in instruction, other educational and general needs are determined, an appropriate inflation factor is applied to render the calculation current, and deductions are made for funds to be self-generated by the institutions, again according to mission.

The Board of Trustees determines investment in instruction by field of study for the reason that some disciplines and programs are less expensive to teach than other disciplines. Also, the Board of Trustees calculates instruction investment by level of study since lower level classes (freshman and sophomore) are less expensive than upper-level instruction (junior and senior) and substantially less expensive than graduate study. The institutional groupings are made according to mission not only because of such differences in program offerings but also due to significant distinctions in research and public service responsibilities.

In determining the cost of instruction at each of the institutions of higher learning, the Board of Trustees examines the number of programs and courses taught the previous year at a given institution, the current academic year, and the actual credit hours generated by those classes for each level of study. When the Board of Trustees receives this information from each university at the end of each academic year, Board employees then visit each campus and audit the courses to verify the accuracy of the credit hour activity report. From this information the Board of Trustees determines what the cost per credit hour is at each institution. Once cost per credit hour is established in each of the various disciplines for each level of study, the institutions are grouped by mission and then the average cost per credit hour for each group is calculated.

There are three groups for the purposes of making average cost estimates. Group I consists of the comprehensive universities. Group II is the urban university, Jackson State University. Since there is only one university with that mission designation, the Board of Trustees decided to include also the University of Southern Mississippi for the purposes of establishing an average. The Board of Trustees justifies the inclusion of the University of Southern Mississippi with Jackson State University on the basis that it is the closest to Jackson State University in size in terms of number and level of programs. Group

III includes the remaining institutions, that is, the regional universities, including Alcorn State University, Delta State University, Mississippi Valley State University, and Mississippi University for Women. An average group rate for each of these groups is thus determined and then applied to the total credit hours taught at the individual universities. Multiplying total credit hours taught times the average group rate will yield the cost in instruction at each university.

The formula group rate for instruction, as determined by the formula, is then set at a certain percentage of total need. Cost for instruction is said to represent 45% of the total need for the comprehensive universities, 47.5% for the Group II institutions, and 50% for the Group III institutions. This amount is then expanded by a certain percentage in order to cover all other functional areas, such as research, public service, student services, operations, and maintenance, and institutional support. Again, this percentage is set according to mission classification. Thus, cost in instruction for Group I institutions, representing 45% of total need, is expanded by 55% to cover the other functional areas. At the Group II institution, the cost in instruction is expanded by 52.5% and the Group III institutions' cost in instruction is expanded by 50%. The resulting figure is then expanded again to take into account inflation since the figures used in calculating institutional need are based on the previous year's data. Finally, each institution is expected to self-generate a portion of its budget. Group I institutions are expected to generate approximately 32% of their total need; these amounts are to be derived from student fees, other sales and services of educational activities, and charges for public service activities. The Group II institution is expected to self-generate 30% of its budget needs, and the Group III institutions are expected to self-generate 26% of their budget needs. Deducting the self-generated amount as described above will yield the total request for appropriations for the particular institution for the upcoming academic year.

The court heard expert witnesses testify pro and con on the issue of whether the present funding formula unconstitutionally discriminates against the predominantly black universities and therefore against the plaintiffs themselves. Studies have shown that the quality of educational institutions has not risen dramatically until they have attained considerable size—usually surpassing 10,000 full-time students. Instead of trying to divide more evenly the limited annual appropriation received by the Board of Trustees, it appears to the court that the Board would do well to build the quality and size of one of the comprehensive universities to that of universities in adjacent states which have created one leading flagship institution for the state, e.g., University of Arkansas, University of Tennessee, and Louisiana State University. Then the students of the state, black and white, would have educational opportunities available to them from at least one leading research university which do not now exist with scattered competing institutions clamoring for larger parts of the limited lump sum appropriation. The state is not required by the United States Constitution to maintain even a single university, and *a fortiori*, not eight. Of course if a state chooses to create and maintain public universities it must fund and administer them without regard to race or sex. *MUW v. Hogan*, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). The establishment of a large, comprehensive, research institution which is open to all the qualified citizens of the state without consideration of race is a course of action not in contradiction to the Constitution or the laws of the United States. Politically, to channel the amount of money from the annual appropriation necessary to develop and support a flagship university, although economically and educationally advantageous to the state, would be an unpopular action with some alumni and in the areas served by the other universities if it would decrease the funding of the other seven. The Board of Trustees has recognized that the students of this state would have higher quality educational opportunities if funds are taken from institutions whose continued fund-

ing is economically illogical and use them in improving the larger comprehensive institutions;[3] however, the legislature has not agreed on a course of action in which the economic and educational advantages clash with the political considerations.

The funding formula does not treat the predominantly black institutions inequitably. Mississippi Valley State University, for example, benefits substantially under the institutional groupings. The grouping of Mississippi Valley State University with the other three regional universities, particularly Delta State University, has given Mississippi Valley State University significantly higher funds for instruction than the sums actually expended for instruction. Conversely, Delta State University has been consistently funded at rates below sums actually expended for instruction. (Board Exhibits 361–364.) Jackson State University has also greatly benefited from having been grouped with the University of Southern Mississippi. (Board Exhibits 361–364.)

The Board of Trustees has on occasion departed from the pure formula allocation. Such departures, however, have benefited the predominantly black institutions. For the period 1981–82 through 1986–87, Mississippi Valley State University received $1,518,923.00, Alcorn State University received $1,101,167.00, and Jackson State University received $552,759.00 more than otherwise would have been received under a pure formula allocation. During the same time period Mississippi State University received some $4,134,846.00 less, and the University of Southern Mississippi $3,775,936.00 less than called for by the formula. (Board Exhibit 360.)

Comparing Mississippi institutions with their peers in surrounding states, the court finds that the three comprehensive universities were under-funded by more than 15% when compared to institutions of similar mission in the Southeast region. Jackson State University, however, was 9% above

the regional average for like institutions, and the four regional institutions in Mississippi were more than 25% above the regional average for institutions of comparable mission in other states. Similar patterns have prevailed in Mississippi at least over the past decade. The plaintiffs have argued and alumni have called for a change in the funding of the universities which would allow the smaller predominantly black universities to "keep up" with or "compete" with the larger predominantly white universities. The court notes that even respected newspapers have editorialized in favor of this position.[4] Such an argument is misplaced. A regional institution has a mission, a purpose, that is not designed for the "keeping-up" with or "competing" with the comprehensive universities. The funding allocation to the Board of Trustees is of a limited amount. The comprehensive universities must of necessity receive the larger amounts if they are to remain capable of carrying out their missions. Authorities advocate that they should receive more dollars per student. As long as the larger, comprehensive universities are open to all qualified students, both black and white students gain.

### G. Facilities

From 1964–65 to 1984–85, statewide full-time equivalent enrollment at the eight universities nearly doubled to a peak of approximately 45,000 students. (U.S. Exhibit 836(b).) Enrollment growth was accompanied by a substantial increase in campus space and plant investment. (U.S. Exhibit 835, page 27; U.S. Exhibit 836(e); U.S. Exhibit 836(1).) The state's response to the increase in enrollment over this twenty-year period was inconsistent in the early years in the sense that a disproportionate share of the funds allocated for faculty expansion was received by the historically white institutions. In more recent years, significant expenditures have been made to increase the physical facilities at the histor-

---

**3.** The Board announced its decision in 1986 to close Mississippi University for Women, Mississippi Valley State University, the Veterinary School at Mississippi State University, and the Dental School at the University of Mississippi.

**4.** *See The Clarion Ledger, Jackson Daily News,* August 21, 1987 Editorial.

ically black institutions. Despite having only approximately 25% of the total system-wide enrollment, the historically black institutions received 39% of the state appropriations from 1970 through 1980 for new construction, and from 1981 through 1986 received 51% of such funds. (Board Exhibit 304, page 1; Board Exhibits 326–330; Board Exhibit 344.) During the period 1981 through 1986, the state building commission allocated over 30% of all major repair and renovation appropriations to the predominantly black institutions. (Board Exhibits 331–338.)

The expenditure of substantial funds by the State of Mississippi in response to the increasing student enrollment in the higher education system resulted in a significant expansion of campus facilities at each institution. Campus space may be measured either in terms of gross square feet or net assignable square feet. Gross square feet is an architect's term measuring the outline of the floors of a building and adding these to reach total square footage. Net assignable square feet is a smaller number than gross square feet, representing the amount of space available for functional purposes and would exclude vestibules, halls, closets, etc. The total increases in campus gross square feet from 1960–61 to 1984–85 range from 682,000 gross square feet at Delta State University to almost 3.3 million gross square feet at Mississippi State University. During the first five years (1960–65), Alcorn State University, Jackson State University, and the University of Southern Mississippi achieved a growth rate of 100%. In the most recent five-year period (1980–85), additions to plant range from 0 to 5 percent, with the exception of Jackson State University, which achieved a growth rate of 21.5 percent. Overall, space on the eight university campuses expanded from 6.5 million gross square feet in 1960 to 18.2 million gross square feet today and replacement value (in constant dollars) increased from approximately $200,000,000.00 to over $920,000,000.00. (U.S. Exhibit 836.)

Perhaps the most useful indicator of facilities resources is the amount of functional or net square feet of space per full-time equivalent student. The University of Southern Mississippi, a historically white comprehensive institution, has the smallest amount of net square feet per full-time equivalent student. When all eight institutions are ranked, the historically black institutions rank second, third, and seventh in total square feet per full-time equivalent. (U.S. Exhibit 836(k).) From the way in which the eight Mississippi universities fall within the rankings, the court finds that there is no correlation between the amount of campus space and the historical racial designation of the institutions.

Over the past 25 years, the historically black institutions consistently had a higher increase than did the historically white institutions in gross square feet and net square feet added. The historically black institutions experienced increases in total space of 381% while the historically white institutions experienced increases of 150%. The historically black institutions increased by 76% in gross square feet per student while historically white institutions increased 26%.

The physical plant of the higher education institution is a basic tool to facilitate its educational programs. There is a close relationship between facilities and the development or expansion of academic programs. A recent publication by the Carnegie Foundation reported that 62% of the students surveyed stated that facilities were the most important factor in their interest in an institution. The particular mix of facilities found at a given institution defines its "character." Objectively, one might include such factors as the age and construction type and design of campus buildings, their condition, ease of access, extent of land holdings, ability to expand, and visual images in defining institutional character. The subjective factors include the opinions of the academic community and the media and the opinions of parents, alumni, and students.

The character of the historically black institutions in 1954 was acknowledged to be inferior or unequal to that of the historically white institutions at that time. The facilities at the historically black institutions in 1954 were deemed to be adequate

for undergraduate education. In 1986, the character of Jackson State University changed to that of what would be expected at a research university with limited ability to conduct research at the graduate level. With respect to the present-day character of Alcorn State University and Mississippi Valley State University, the court finds facilities commensurate with institutions with an undergraduate mission.

Mr. Richard Dober of Cambridge, Massachusetts, a noted lecturer and author of over fifty books on campus planning and adviser to China on educational facilities, studied the physical facilities of the eight institutions in Mississippi. Mr. Dober testified he found no correlation between the racial identity of the institutions and the quality of the facilities at the institutions and the court so finds.

### H. Governance

#### The Board of Trustees of the Institutions of Higher Learning

The Board of Trustees consists of thirteen members appointed by the governor, with the advice and consent of the Mississippi Senate. Twelve members are appointed to twelve-year terms, in groups of four, every four years. Ten of the twelve members are to be appointed from and must be residents of the several designated districts (Congressional or Mississippi Supreme Court Districts), and two are to be appointed from the state at large. The thirteenth member is appointed "for the University of Mississippi . . . and shall have a vote only in matters pertaining to the University. . . ." This member, known as the Trustee for the LaBauve Fund, serves a four-year term.[5] (Miss. Const. Sec. 213–A (1890); U.S. Exhibit 1, page i; U.S. Exhibit 636, page 1). There are no stated written criteria for selection of board members. Those appointed to serve on the Board of Trustees have represented various professional backgrounds.

No black person was appointed to the Board of Trustees from 1932 through 1971. The first black person to serve on the Board of Trustees, Dr. Robert Walker Harrison, was appointed in 1972. Since that appointment, three additional blacks have been appointed and three blacks presently serve on the Board. Elected by the membership of the Board of Trustees, blacks have served as president and vice-president of the Board. Blacks have also served as chairmen of numerous Board committees. A close working relationship and strong sense of collegiality exist among white and black Board members.

The Board of Trustees selects an executive secretary who, *inter alia*, employs necessary professional staff, subject to Board approval. (U.S. Exhibit 636, page 8.) The Board's first two black professional staff members were not employed until 1974. (U.S. Exhibit 936, page 36.) At present, the staff responsible for the day-to-day operations of the Board of Trustees consists of twenty-three persons, six of whom are black. Moreover, four of the six blacks on this staff are professionals. Apart from the maintenance staff, the other major staff segment employed by the Board of Trustees is responsible for overseeing the guaranteed student loan program. This group consists of approximately fifty persons, seventeen of whom are black.

### III. Conclusions of Law

#### A. General

The private plaintiffs' claims are based upon the Thirteenth and Fourteenth Amendments, 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, 34 C.F.R. Part 100 (administrative regulations effectuating Title VI), and 42 U.S.C. § 1981. *See Guardians Association v. Civil Service Commission*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (private cause of action implied in

---

**5.** H.Con.Res. 19 (1987) (Miss.) (H01.H87R193.-AHS) proposed to amend Section 213–A, Mississippi Constitution of 1890, by deleting the provision for the LaBauve Trustee. This proposal was ratified in the November, 1987 election thereby concluding the abolishment of this trustee position.

Title VI). The claims of the United States [6] are based upon the Fourteenth Amendment and Sections 601 and 602 of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d and 2000d–1.[7]

The defendants do not dispute that Mississippi law forbade interracial education at the university level up to the time of the decision in *Meredith v. Fair*, 305 F.2d 343 (5th Cir.1962). Defendants' racially segregative policies at that time encompassed the areas of: (1) student enrollment, (2) maintenance of branch centers by the historically white universities in close proximity to the historically black universities, (3) employment of faculty and staff, (4) provision and condition of facilities, (5) allocation of financial resources, (6) academic program offerings, and (7) racial composition of the governing board and its staff. The fundamental issue before the court at this time, however, is whether the defendants are currently committing violations of the Thirteenth and Fourteenth Amendments, Title VI and 42 U.S.C. § 1981. This case differs in an interesting way from the usual lawsuit. The usual complaint charges that certain facts exist at the time of filing suit and the evidence at trial is retrospective—that is, it looks back to events that allegedly occurred prior to the filing. In this case the issue is over what the facts are at the time the case is being tried, 12 years after the filing of the case.

■ At the very least, a state choosing to operate a system of public higher education has the duty to adopt and implement good faith, racially nondiscriminatory policies and practices. Black applicants must be admitted to public institutions of higher education "under the rules and regulations applicable to other qualified candidates." *Florida ex rel. Hawkins v. Board of Control*, 350 U.S. 413, 414, 76 S.Ct. 464, 465, 100 L.Ed. 486 (1956); *Sweatt v. Painter*, 339 U.S. 629, 636, 70 S.Ct. 848, 851, 94 L.Ed. 1114 (1950); *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 352, 59 S.Ct. 232, 237, 83 L.Ed. 208 (1938). Where a state has previously maintained a racially dual system of public education established by law, it assumes an "affirmative duty" to reform those policies and practices which required or contributed to the separation of races. *Milliken v. Bradley*, 433 U.S. 267, 290, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977). *See also Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). At the elementary and secondary education level the courts have defined the affirmative duty to include also the elimination of all "vestiges" or effects of the former *de jure* segregated system. *Green v. School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

The courts are unanimous in holding that the affirmative duty to dismantle a racially dual structure in the elementary and secondary levels applies also in the higher education context. *See, e.g., Geier v. University of Tennessee*, 597 F.2d 1056 (6th

---

**6.** The Attorney General of the United States, upon receipt of a referral from the Department of Education, has the authority to sue on behalf of the United States to enforce statutory requirements and contractual assurances of nondiscrimination made pursuant to the operation of federally assisted programs administered by public institutions of higher education. Section 602 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1; *United States v. Marion County School District*, 625 F.2d 607, 611–13 (5th Cir.1980).

**7.** As recipients of federal financial assistance, the State of Mississippi and its agencies exercising management and control of the public colleges and universities are prohibited from discriminating against any individual on the basis of race, color or national origin. Section 601 of Title VI essentially prohibits discrimination which violates the Equal Protection Clause of the Fourteenth Amendment. *Regents of the University of California v. Bakke*, 438 U.S. 265, 281–87, 98 S.Ct. 2733, 2743–46, 57 L.Ed.2d 750 (opinion of Powell, J.); *id.* at 327, 98 S.Ct. at 2767 (opinion of Brennan, J.) (1978). Section 604 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–3, does not bar the United States from maintaining an action under Title VI that is, in part, aimed at eliminating the segregation of faculties at institutions of higher learning. *Caulfield v. Board of Education of the City of New York*, 632 F.2d 999, 1005 (2d Cir.1980); *United States v. Jefferson County Board of Education*, 372 F.2d 836, 883 (5th Cir.1966), *aff'd en banc*, 380 F.2d 385 (5th Cir.), *per curiam cert. denied*, 389 U.S. 840, 88 S.Ct. 67, 77, 19 L.Ed.2d 103, 104 (1967).

Cir.1979); *United States v. State of Alabama*, 628 F.Supp. 1137 (N.D.Ala.1985); [8] *Norris v. State Council of Higher Education*, 327 F.Supp. 1368 (E.D.Va.) (three-judge court), *aff'd, sub nom.*, *Board of Visitors of the College of William & Mary v. Norris*, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971); *Lee v. Macon County Board of Education*, 317 F.Supp. 103 (M.D.Ala.1970) (three-judge court), *aff'd in material part*, 453 F.2d 524 (5th Cir.1971); *Alabama State Teachers Association (ASTA) v. Alabama Public School and College Authority*, 289 F.Supp. 784 (M.D. Ala.1968) (three-judge court), *aff'd*, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969). There is, however, substantial disagreement on the question of whether the scope of the duty is as broad in the higher education context as has been defined and applied in the elementary and secondary education context.

Several courts, relying on the Supreme Court decision in *Green v. School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), have concluded that some level of racial mixture at previously segregated institutions of higher learning is not only desirable but necessary to "effectively" desegregate the system. *See Geier v. Alexander*, 801 F.2d 799 (6th Cir.1986). Others, relying on the Fifth Circuit authority *Alabama State Teachers Association ("ASTA") v. Alabama Public School and College Authority*, 289 F.Supp. 784 (M.D.Ala.1968), maintain that a state's affirmative duty is satisfied by the good faith adoption of race-neutral policies and procedures. *See Artis v. Board of Regents of the University System of Georgia*, No. CV479–251 (slip op.) (S.D.Ga. February 2, 1981) (unpublished).

Upon consideration of the pertinent case law the court is of the opinion that the more narrowly defined duty set forth in *ASTA* should control in this case. The Supreme Court in *Green* struck down a "freedom of choice" plan that was designed to desegregate elementary and secondary schools but which had failed to appreciably alter the racial identifiability of the schools.

Focusing on the results of official actions rather than on the apparent presence or absence of good faith underlying such action, the Court required affirmative steps, including the establishment of mandatory attendance zones, "which promise realistically to convert promptly to a system without a 'white' school and a 'negro' school, but just schools." *Green*, 391 U.S. at 442, 88 S.Ct. at 1696. As is apparent from a contextual reading of *Green* and subsequent Supreme Court and lower court decisions considering the nature and extent of the state's duty to desegregate at the elementary and secondary level, the affirmative duty as delineated in these cases rests upon the traditional power vested in local school authorities to dictate attendance patterns in compulsory elementary and secondary school systems, that is, to order certain students to attend certain schools. The circumstances in the higher education field, however, are different.

In *ASTA*, plaintiffs challenged a proposed expansion of a historically white higher education institution located in close proximity to a historically black institution alleging that the state officials overseeing the proposed expansion failed to adequately consider how the expansion could be carried out so as to maximize integration and the enhancement of facilities and programs found at the historically black school. 289 F.Supp. at 789. The court, however, rejected plaintiffs' argument that school officials were under an obligation to choose policy alternatives which maximized the integration of component institutions. Based on what it perceived to be certain qualitative differences existing between elementary-secondary schools and institutions of higher learning, the court accordingly refused to adopt the proposition that the scope of the affirmative duty in higher education extended as far as in elementary and secondary education. *Id.* Instead, the *ASTA* court concluded that the affirmative duty to disestablish or "dismantle" a dual higher education system is fulfilled by the adoption and implementation of "good faith nondiscriminatory policies." *Id.* at 789–90.

**8.** Overruled by 11th Circuit, 828 F.2d 1532 (11th Cir.1987), but not on merits of case.

Writing for the three-judge court, Judge Frank M. Johnson stated:

Higher education is neither free nor compulsory. Students choose which, if any, institution they will attend. In making that choice they face the full range of diversity in goals, facilities, equipment, course offerings, teacher training and salaries.... From where legislators sit, of course, the system must be viewed on a statewide basis. In deciding to open a new institution or build a branch or expand an existing institution, and in deciding where to locate it, the legislature must consider a very complicated pattern of demand for and availability of the above-listed variables, including, also, impact on the dual system. We conclude that in reviewing such a decision as to determine whether it maximized desegregation we would necessarily be involved, consciously or by default, in a wide range of educational policy decisions in which courts should not become involved.

*ASTA*, 289 F.Supp. 788. The court concluded by stating that:

[A]s long as the State and a particular institution are dealing with admissions, faculty and staff in good faith the basic requirement of the affirmative duty to dismantle the dual system on the college level, to the extent that the system may be based on racial considerations, is satisfied.

*Id.* at 789–90. The Supreme Court affirmed by *per curiam* decision *ASTA*'s holding that good faith implementation of nondiscriminatory policies satisfies the state's affirmative duty to desegregate a higher education system. *ASTA*, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969). *See also Lee v. Macon County Board of Education*, 453 F.2d 524, 527 (5th Cir.1971) (observing that the principles of public school desegregation have not been applied to institutions of higher learning in same manner as have been applied to elementary and secondary schools).

The *ASTA* court made a distinction between the state's duty in the higher education field as distinguished from the secondary and elementary education areas. This distinction was buttressed by the Supreme Court's recent decision in *Bazemore v. Friday*, 478 U.S. ——, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986). *Bazemore* in part involved a fourteenth amendment challenge of the North Carolina Extension Service 4–H and Homemaker Clubs which had been racially segregated by law prior to 1965. 106 S.Ct. at 3012. Even though the clubs continued to exhibit marked racial imbalance, the Court found that the Extension Service had "disestablished segregation" by adopting a policy allowing all club members to freely choose which club they wished to join. 106 S.Ct. at 3013. The Court distinguished *Green*'s condemnation of "ineffective" freedom of choice plans in local public schools on the grounds that "while school boards customarily have the power to create school attendance areas and otherwise designate the school that particular students may attend, there is no statutory or regulatory authority to deny a young person the right to join any club he or she wishes to join." *Id.* Thus, *Bazemore* draws a clear distinction between elementary and secondary education systems and those systems where admissions are traditionally determined by voluntary choice. In the latter context, the affirmative duty to desegregate does not contemplate either restricting choice or the achievement of any degree of racial balance.

The court perceives no inconsistency with respect to the Supreme Court decisions *Green* and *Bazemore* and the *ASTA* decision. These decisions stand in harmony for the proposition that the scope of the affirmative duty to disestablish a former *de jure* segregated system of education is to be defined in accordance with the degree of choice individuals enjoy as to whether they wish to attend college at all and, if so, which one. Where "choice" is traditionally controlled by the state, in elementary and secondary education, the state is required to exercise its control in a way which maximizes the racial integration of component institutions. Although the continued racial identifiability of educational institutions per se is not violative of the Constitution or Title VI, *see Dayton Board of Education*

*v. Brinkman,* 433 U.S. 406, 419–20, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977), the question of whether the state has fulfilled its affirmative duty in the elementary and secondary sphere is determined by assessing the results of state policy, that is, whether the policies implemented in fulfillment of the affirmative duty have substantially affected the racial mix of the schools involved. The overwhelming emphasis on the results of official policy in this context is appropriate since direct official control over attendance decisions can be expected to produce an immediate tangible impact on racial attendance patterns.

In the college and university education context, however, where individuals have traditionally enjoyed free choice as to whether and when to attend school, the courts have considered it inappropriate to require state officials to maximize integration when assessing official action vis-a-vis the affirmative duty to disestablish a former *de jure* segregated system. The wisdom of this approach does not rest solely upon traditional notions, however. It also rests on the qualitative distinctions existing between the post-secondary and the elementary-secondary education systems. Elementary and secondary schools in a single district tend to be fungible in the sense that they generally strive towards uniformity in offerings, facilities and services. The opposite is true in higher education. A special emphasis is placed upon the relative uniqueness of the separate institutions comprising a public system of higher education. Indeed, the uniqueness of institutions which results from the confluence of course offerings, services, size, location, faculty and students found at each institution, explains why freedom of choice is so valued and why the courts have not required the restriction of student choice in higher education. Thus, given that the state is not obligated to control student choice in fulfilling its duty to disestablish a former *de jure* segregated system of higher education, it would be inappropriate to emphasize the relative degree of integration of each institution in determining whether the state has satisfied its duty. While student enrollment and faculty and staff hiring patterns are to be examined, greater emphasis should instead be placed on current state higher education policies and practices in order to insure that such policies and practices are racially neutral, developed and implemented in good faith, and do not substantially contribute to the continued racial identifiability of individual institutions. *See Brinkman,* 433 U.S. at 413, 97 S.Ct. at 2772; *Milliken,* 418 U.S. at 744–45.

## B. Student Admission, Recruitment and Retention

### 1. Use of the ACT Assessment

**Should the Pre–Med Student Have Lower Entrance Requirements Than the Tight End?**

■ The private plaintiffs and the United States claim that the defendants continue to deny students equal access to the system of higher education on the basis of race. This challenge centers principally on the use of the ACT test scores as a requirement for admission to each of the eight institutions. The plaintiffs argue that the evidence shows the Board of Trustees adopted and has continued to use the ACT testing requirement for the purpose of minimizing the numbers of black persons eligible to enroll in the system of higher education and segregating black persons within that system, in violation of the Fourteenth Amendment and Title VI, 42 U.S.C. § 2000d et seq. *See, e.g., Washington v. Davis,* 426 U.S. 229, 239–40, 242, 96 S.Ct. 2040, 2047–48, 2049, 48 L.Ed.2d 597 (1976).

Plaintiffs argue that the analytical factors delineated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266–68, 97 S.Ct. 555, 564–65, 50 L.Ed.2d 450 (1977), applied to the facts in the instant case, demonstrate the discriminatory intent on the part of the Board of Trustees with respect to both the adoption of the ACT requirement and its continued use. Plaintiffs contend that two of the *Arlington Heights* factors in particular—an evaluation of the historical background of the decision and the specific sequence of events leading up to the challenged decision—support the conclu-

sion that the ACT standard was originally adopted by the Board of Trustees in 1962 after James Meredith had applied for admission to the University of Mississippi, in order to minimize the desegregation of the historically white institutions. As support for their contention that the continued use of the ACT requirement is motivated by discriminatory intent, plaintiffs note "that the [standard] bears more heavily on one race than another." *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. at 2049. Further, it is contended that the employment of differing ACT requirements at each of the various institutions in effect channels those black persons eligible for admission to the historically black institutions, thereby perpetuating the racial status quo. It is also argued that the use of the ACT minimum score requirement is marked by "substantive departures," *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564, in the sense that the Board of Trustees has used the ACT test scores in a manner inconsistent with the policies of the American College Testing Program, which recommends the consideration of high school grades in conjunction with the ACT test scores in making admission decisions, with the effect of reducing the numbers of blacks who might otherwise be eligible for admission if grades were included.

We start with the proposition that no educational requirement is permissible if adopted and maintained for a discriminatory purpose. *See Arlington Heights,* 429 U.S. at 256, 97 S.Ct. at 559; *Washington v. Davis,* 426 U.S. 238, 96 S.Ct. at 2046. While the circumstances surrounding the Board of Trustees' adoption of the ACT assessment in 1962 lead this court to find that the ACT assessment was in fact adopted "... because of, not merely in spite of its adverse effects upon an identifiable group," *Personnel Administrator v. Feeny,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979), much time has passed since 1962 and much has transpired with respect to the Board of Trustees' student admissions policies. First, it should be noted that the Board of Trustees did not adopt specific ACT test score minimums for the institutions of higher learning in 1962. It was not until May of 1976, effective the Fall of 1977, that the Board of Trustees established minimum ACT scores for college admission. The policy stipulated that no student was to be admitted to any institution as a first-time freshman who failed to achieve an ACT score of 9. The policy at that time also provided that those institutions presently requiring higher minimum ACT scores were to continue those requirements. The circumstances surrounding the adoption of this minimum ACT test score in 1976, however, do not indicate that this policy was adopted for discriminatory purposes. It is apparent to the court that legitimate questions were raised at that time with respect to the level of scholastic preparation of entering freshmen.

The court also finds that the Board appropriately justified its varying ACT minimum test score requirements within the university system by acknowledging the potentially deleterious impact upon institutional enrollments, particularly at the three historically black institutions, if a uniform score were adopted. It was clear that setting an ACT minimum score of 15 for the historically black institutions would decimate existing student enrollments. Although conceding that an ACT score of 9 was a shockingly low level of achievement for university-bound students, the Board of Trustees recognized that the realities of the student body composition at that time required that a low score be utilized at those universities. During the past several years, the gap which had existed between the historically white and the historically black institutions as to ACT minimum scores has narrowed considerably.

The court also finds adequate justification for the Board of Trustee's decision not to adopt high school grades as a component of the admission requirements. Evidence was presented at trial which indicated that the Board of Trustees was, and continues to be, concerned about grade inflation and the lack of comparability in grading practices and course offerings among Mississippi's diverse high schools. Furthermore, the ACT organization advised the Board of

Trustees in 1976 that although inclusion of grades with ACT test scores was a sound indicator of both level of preparation and likelihood of success at the freshman level in college, the use of the ACT test score alone was also a valid indicator. ACT's position remains unchanged.

There have been a number of other revisions of the admission requirements which, given the circumstances existing during such times, indicate that the Board of Trustees was in fact responding to legitimate educational and fiscal concerns and not to the relative racial mix at the historically white institutions. Most recently, and consistent with a concern regarding the academic readiness of entering freshmen, the Board of Trustees in July, 1982 adopted high school course requirements for implementation in the Fall of 1986. There is strong evidence that the adoption of the core curriculum requirement has in fact raised the level of academic preparation of entering freshmen as measured by an improvement on the ACT test scores of those students completing the core curriculum requirements.

The court finds that the current admission policies and procedures, including the particular use to which the ACT assessment is put, were not adopted for racially discriminatory purposes and are reasonable, educationally sound, and racially neutral. There can be no doubt that the ACT test score is a reliable instrument frequently used as an integral component of college admission standards. As previously noted, every state in the United States has at least one institution making use of the ACT data and it is the predominant admission test in some 28 states. In addition to providing a highly relevant status report on student school achievement, the ACT, as a standardized instrument, enables Mississippi educators to assess uniformly the level of academic preparation of students graduating from high schools across the state. In addition, the positive correlation between performance on the ACT and academic achievement during the freshman year at Mississippi universities is well established.

While average ACT scores do differ among Mississippi black students as contrasted with Mississippi white students, the Board-established minimum ACT scores are extremely modest levels of required performance. Nationally, 95% of all ACT tested students score 9 or above and over 70% of all students score 15 or above. Nine out of every ten ACT tested students in Mississippi, including 80% of all black students, score 9 or above on the ACT; and students who achieve a 9 on the ACT English and social studies tests are only reading at a ninth grade level. Indeed, the Board of Trustees' admission standards are even more modest than the recently adopted NCAA Proposition 48 which requires achievement of specified ACT composite scores in order for student athletes to be eligible to participate in athletics. Beginning in August, 1988, all student athletes must achieve an ACT composite score of 15 and at least a 2.0 grade point average on a 4.0 scale. Unlike the Board's standards, there are no exceptions to this 15 requirement and, further, the Board does not require students to achieve the 2.0 grade point average. The court is of the opinion that it would be regressive to order the universities of this state to adopt an admissions policy in which entering pre-med and pre-law students have lower admission requirements than a physical education student who is on scholarship to play tight end.

In the absence of a showing of intentional discrimination, the standards under the Fourteenth Amendment and Title VI do not require the state to modify or lower valid admission or other educational standards even if those standards have a disparate impact on minority or other-race students and even if there exist other reasonable alternatives with less disparate impact. As the Fifth Circuit Court of Appeals has held in *LULAC v. Texas*, 793 F.2d 636, 649 (5th Cir.1986), a case involving an attack on admission standards for a teacher education program in a formerly segregated higher education system, "even a state that formerly practiced de jure segregation is not required by the [Equal Education Opportunity] Act to suspend or lower valid

academic standards." Similarly, a Title VI violation is established either under the standard "disparate impact" analysis or the affirmative duty outlined above, "only if the challenged test is not a reasonable measure of a bona fide educational requirement." *Id.* The rationale for this rule is simple. "If the [challenged educational standard] is valid, enjoining its use would not, in any meaningful way, counteract the effects of past segregation, but might simply serve to perpetuate a dual standard," *id.*, by reinforcing the stereotype that minority students cannot satisfy generally applicable educational standards and by diluting educational benefits offered to all students, black and white. Indeed, if valid academic standards were lowered to eliminate a disparate impact, this would simply serve to lock in, not correct, any educational deficiencies suffered by black children in elementary and secondary schools, by "celebrating and perpetuating the hollow certification that accompanied black graduation pre-*Brown v. Board of Education.*" *Deborah P. v. Turlington,* 654 F.2d 1079, 1085 (5th Cir.1981) (Tjoflat, J., dissenting from denial of rehearing en banc).

If Title VI is construed to prohibit the establishment of reasonable academic standards simply because they tend to reinforce the racial identifiability of previously segregated colleges, it might well be argued that formerly black schools are obliged to raise academic standards if this reduces black participation or increases white representation. No such rule, however, can be derived from the Constitution or Title VI. In addition, the Supreme Court has consistently emphasized that courts "are particularly ill-equipped to evaluate [academic decisions]" and that this consideration "warn[s] against any such judicial intrusion into academic decision-making." *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 92, 98 S.Ct. 948, 956, 55 L.Ed.2d 124 (1978).

As to plaintiffs' argument that current admission policies in effect "channel" black students to the historically black universities, the only pertinent data presented at trial revealed that the utilization of the ACT composite score of 15 as a require-ment for admission at the historically white institutions and the use of an ACT composite score of 13 at the historically black institutions do not substantially contribute to the continued racial identifiability of Mississippi universities. The historically black institutions are not predominantly black because black students who first preferred to attend a historically white institution were "channeled" to black institutions after failing to achieve a test score of 15. As previously pointed out, practically all the black students who applied to predominantly white universities in the Fall of 1986 were accepted.

Finally, private plaintiffs also suggest that the current admission standards perpetuate the prior intentional discrimination at the elementary and secondary school levels. Plaintiffs cite *Geier v. Alexander,* 801 F.2d 799 (6th Cir.1986) for the proposition that the Board of Trustees must "compensate" for unequal educational opportunities at lower education levels. Although *Geier* alluded that a district court's consideration of conditions in public elementary and secondary school systems was appropriate in fashioning a remedial plan, that is a far cry from establishing a *duty* to consider the conditions found at the elementary and secondary levels. Further, the Fifth Circuit's holding in *LULAC* is clear that higher education systems are under no legal obligation to "compensate" or "remedy" constitutional infirmities existing at the elementary and secondary school levels. *LULAC,* 793 F.2d at 647.

Given the foregoing, the court finds that current Board admission policies in force among the institutions of higher learning, including the use of the ACT test scores in conjunction with the core curriculum requirement, are inherently reasonable and educationally sound after giving due consideration to the discriminatory taint attached to ACT requirements by the Board of Trustees' initial adoption of the ACT assessment in 1962.

### 2. Student Recruitment and Retention

■ The defendants have for a number of years made well known their desire to

attract and recruit minority race students at each institution, especially the historically white institutions. Each institution implements various techniques in accomplishing this objective. For example, universities employ other-race recruiters charged with specific responsibility for recruiting other-race students. Multi-racial recruiting teams are frequently used. In addition, recruitment brochures and other university publications highlight a commitment toward other-race participation. Indeed, with respect to the universities' recruitment initiatives at high schools and junior colleges, the Board of Trustees has prohibited recruitment at schools which fail to execute an agreement allowing multi-racial recruiting teams. The evidence also shows that other-race students who choose to attend any of the eight Mississippi institutions enjoy desegregated campus environments.

The above practices are reasonable and affirmative efforts by the defendants with respect to the recruitment of other-race students at each institution. Although recruitment of minority students is a competitive business, every institution within the system seems to strive for increased enrollment of students of all races. Such competition has understandably affected each institution's ability to attract other-race students. We find, in any event, that other-race recruitment efforts have been successful and evince the defendant's commitment to the maintenance of a state-wide system which not only speaks of a nondiscriminatory policy and practice but also affirmatively encourages minority participation in the system. The statistics presented at trial also demonstrate success in that the actual representation of blacks in the freshman classes at Delta State University, Mississippi State University, Mississippi University for Women, and the University of Southern Mississippi is in statistical parity with the representation of blacks in the qualified pools. The proof shows that qualified blacks and qualified whites are equally likely to apply, be accepted, and enroll at these universities. While the University of Mississippi is absent from this list, there is no evidence to suggest that the lack of black student applications to the University of Mississippi is due in any way to official discriminatory policies or practices.

Pursuant to the terms set forth in the 1974 Plan of Compliance, defendants have expended considerable efforts toward improving the retention rate of minority students by developing and implementing developmental studies programs at each institution. We find that the rather substantial success of the programs underscores the good faith effort undertaken by the defendants with respect to the recruitment of minority students.

### 3. Admissions Policies

#### Conclusion

In summary, the court finds that the current admission policies and procedures in effect among the Mississippi institutions of higher learning were adopted and developed in good faith and for nondiscriminatory purposes. The defendants' good faith is well illustrated by the affirmative efforts undertaken by the institutions of higher learning towards the attraction and recruitment of other-race students at each institution. Although the various institutions continue to be identifiable by the racial makeup of the student populations, this is not a substantial result of current admission practices and procedures but is instead the result of a free and unfettered choice on the part of individual students. Further, the court finds that the defendants have used every reasonable means at their disposal in their recruitment efforts. Defendants' efforts with respect to other-race student recruitment and retention satisfy their affirmative duty to dismantle the former segregated system insofar as the duty pertains to student enrollment.

### C. The Assignment of Missions and the Allocation of Programs, Funding and Facilities

■ The private plaintiffs and the United States challenge the assignment of missions in 1981 and the current allocation of programs, funding and facilities which flows from the mission designations. The plaintiffs' attack on the policies follows two relatively distinct arguments. First, plaintiffs argue that the affirmative duty to

disestablish a former *de jure* segregated system of higher education should be defined and applied in a way so as to ensure both equal access to the system and the substantial integration of all component institutions. Equal access to the system is provided by the elimination of racially discriminating policies and the implementation of race-neutral student admission and faculty and staff hiring policies and procedures. With respect to integration, while implicitly acknowledging that *Bazemore* and *ASTA* speak against the state being under an obligation to directly influence student attendance choices by implementing, for example, quotas or attendance zones, plaintiffs argue that the state must seek to maximize the racial integration of component institutions through the modification and manipulation of policies in areas which indirectly affect and condition student attendance choices, especially policies in the areas of programs, facilities and funding. It is argued that the modification of existing policy in these areas by increasing the level, number and type of programs and facilities found at the historically black institutions would serve to entice greater numbers of white students to attend the historically black schools. For example, it is argued that the offering of one or more popular Ph.D programs at a black institution, that are not available at a white institution, would attract more white students to the black institution.

Regardless of the context, the affirmative duty to disestablish a former *de jure* system is to be defined in unyielding terms to ensure that all student admission and faculty and staff hiring policies and procedures operate on a racially neutral basis. And although the affirmative duty has been defined to include also an interest in fostering the racial integration of educational institutions once segregated by law, the lengths to which the state must go to integrate its institutions vary according to the degree of control the state possesses over attendance patterns and according to the nature and extent of any interests which may serve to counterbalance the interest in integration. Thus, for example, in *Green*, the Supreme Court placed upon the

defendants the obligation to adopt mandatory attendance zones in an effort to force some degree of integration in formerly segregated elementary schools. In *ASTA*, on the other hand, the court declined to require the defendants to use the proposed expansion of university level educational offerings as an opportunity to enhance a local historically black institution so as to enable the black school to attract greater numbers of white students. The court based its decision upon a recognition of the many interests and factors which confront decision-makers at the higher education level and which serve to counterbalance the desire to integrate each institution. *ASTA*, 289 F.Supp. at 788. "From where legislators sit, of course, the system must be viewed on a statewide basis. In deciding to open a new institution or build a branch or expand an existing institution ... the legislature must consider a very complicated pattern of demand for and availability of [such variables as institutional goals, facilities, equipment and course offerings] including, also, the impact on the dual system." *Id.* The *ASTA* court therefore concluded that the Constitution does not require school officials to pursue policy alternatives which happen to offer the greatest integrative potential at the expense of legitimate racially neutral policies. This court agrees with the holding and the underlying rationale set forth in *ASTA*.

Plaintiffs also argue that the differentiation which exists among the component institutions in the areas of mission, facilities, equipment and funding are disparities causally related to the former *de jure* system since in these areas "normal administrative practices should produce schools of like quality, facilities and staffs." *Swann*, 402 U.S. at 18–19, 91 S.Ct. at 1277. It is therefore argued that the assignment of missions, which is claimed to have favored the historically white institutions at the expense of the historically black institutions, and defendants' allocation of educational resources among the institutions commensurate with the mission designations constitute a denial of equal educational opportunity to the students choosing to

attend the historically black institutions. It is further argued that given these continuing disparities between the historically black and the historically white institutions "the victims of discriminating conduct [have not been restored] to the position they would have occupied in the absence of such conduct." *Milliken v. Bradley*, 433 U.S. at 280, 97 S.Ct. at 2757. Plaintiffs accordingly contend that the defendants' duty to disestablish the former *de jure* system has not been satisfied until the disparities in programs, facilities, equipment, and financing have been eliminated through the enhancement of the historically black institutions and their equalization with the historically white institutions.

Preliminarily, the court notes that the plaintiffs' argument as set out above comes dangerously close to suggesting that institutions are accorded rights under the equal protection clause. There should be no doubt, however, that the equal protection clause has no application to acts of the state taken with respect to its own political subdivisions and agencies. *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933); *Trenton v. New Jersey*, 262 U.S. 182, 187, 191, 43 S.Ct. 534, 538, 67 L.Ed. 937 (1923); *County Department of Public Welfare v. Stanton*, 545 F.Supp. 239, 242 (N.D.Ill.1982). Such entities, as creations of the state, simply have no privileges and immunities against the state and are incapable of experiencing injury under the equal protection or due process clauses of the Fourteenth Amendment. *See Triplett v. Tiemann*, 302 F.Supp. 1239, 1242–43 (D.Neb.1969).

As the court has previously observed, a system of higher education, comprised of a number of separate institutions serving different goals and fulfilling various needs and governed by a common authority, is inherently different from elementary and secondary school systems, which are not marked by diversity but rather are characterized by uniformity. The court therefore does not find as persuasive those authorities relied upon by the plaintiffs in support of their argument that were it not for the former *de jure* system one would have expected and found institutions of substantially the same type, number, and level of program offerings, mission and facilities. To be sure, in reviewing the evidence offered in this case, the court has found a number of differences existing among and between the institutions of higher learning. The court cannot state, however, that such differences are "disparities" reminiscent of the former *de jure* system. Instead, such differences in programs, mission, facilities and funding are usually found, and are to be expected, within a system of higher education which includes eight institutions throughout the state. Surely it cannot be soundly argued that the state should allocate equal monies to each institution. Such a practice would foster mediocrity or worse. It appears to the court that the very limited higher education dollars are too widely dispersed among too many institutions already. As long as qualified students, black and white, can attend the type and quality of available institutions they choose, there is no denial of equal protection. The court will address particular areas of concern in the sections which follow.

### 1. The Assignment of Missions

Plaintiffs argue that the way in which the defendants allocated missions in 1981 in essence freezes in the effects of past discrimination since the three major historically white institutions were the only institutions to receive a comprehensive designation, thus ensuring their continued receipt of the greater share of the available educational resources. Plaintiffs impliedly suggest, too, that the defendants' designation of missions, relegating the three historically black institutions to relatively inferior status by classifying these institutions as either "urban" or "regional," was racially motivated. Plaintiffs conclude by stating that the affirmative duty requires that the current mission classifications be disregarded and that the historically black institutions' academic programs be enhanced in an effort to equalize offerings vis-a-vis the historically white institutions.

The court finds plaintiffs' argument to be unpersuasive. Plaintiffs' argument if accepted could lead the court to conclude

that they want to continue the existence of predominantly black and predominantly white colleges but continue them on an equal quality basis with each other. Ignoring the *Plessy v. Ferguson* doctrinal overtones to plaintiffs' argument, the court finds that the defendants' designation of missions in 1981 was not motivated by a discriminatory purpose but was instead necessitated and justified by a need to conserve scarce educational resources. It is obvious that the allocation of missions based on the then existing programs, facilities and other educational resources found at each institution would best serve the goal of resource conservation. Just as in *ASTA*, the defendants in the instant case were and are under no constitutional duty to utilize the opportunity presented by their decision to define and delimit institutions by mission as a way to maximize the racial integration of component institutions. Furthermore, in view of the fact that the system of higher education and each of the member institutions are accessible to graduating high school students on racially neutral grounds, it cannot be seriously contended that the designation of missions discriminatorily impacts on students enrolled in the urban or regional institutions. The court therefore finds that the current mission designations are rationally based on sound educational policies and are not violative of the equal protection clause.

## 2. Unnecessary Program Duplication

During the trial, plaintiffs attempted to demonstrate that a substantial degree of unnecessary program duplication continues to exist within the system of higher education in Mississippi despite the recent inroads made by the Board of Trustees in lessening the amount of duplication. Apparently, this evidence was intended to produce a logical inference that the level of unnecessary program duplication existing between historically black institutions and the historically white institutions has a negative effect on white student choice to attend the historically black institutions. The plaintiffs accordingly contend that the defendants are required to eliminate existing program duplication in a way that would enhance the program offerings of the historically black institutions, that is, eliminating the unnecessarily duplicative programs from the curriculum of the historically white institutions.

As detailed above, however, the defendants are under no duty to undertake efforts to enhance the historically black institutions without regard to the various other competing interests which influence policy choices in the higher education area, primarily money. Furthermore, there is no proof that unnecessary program duplication is directly associated with the racial identifiability of institutions. In addition, there is no proof that the elimination of unnecessary program duplication would be justifiable from an educational standpoint or that its elimination would have a substantial effect on student choice. Indeed, the experience of other courts assessing the relative impact of the elimination of unnecessary programs between historically white and historically black institutions indicates that the elimination of such programs would have little impact. *See, e.g., Artis*, slip op. at 4. In any event, there is no showing in this case that the elimination of unnecessary programs within the system of higher education in Mississippi would be feasible, educationally reasonable, or would offer any hope of substantial impact on student choice. The court therefore finds that the continued existence of unnecessary program duplication within the system of higher education does not constitute a violation of defendants' affirmative duty.

## 3. Facilities

The court does not perceive a racially discriminatory pattern existing with respect to the allocation and condition of facilities when measuring facility resources by the amount of net square feet per full-time equivalent student. The historically black institutions have over the past 15 years received a higher proportionate share of state appropriations for capital improvements. While having only approximately 25% of the total enrollment, the historically black institutions received 39% of state appropriations from 1970 through 1980 for new construction; and from 1981 through

1986 they have received 51% of such funds. The distribution of funds for capital improvements clearly evinces a good faith affirmative effort on the part of the defendants to provide adequate facilities at the historically black institutions in accordance with their defined mission. While there is a need for repair of facilities at the historically black institutions, the court finds the same need exists across all institutions. We thus perceive no racial pattern with respect to the condition of facilities.

#### 4. Financing

Plaintiffs also advance the argument that the defendants have failed to equitably allocate financial resources at the historically black institutions relative to the historically white institutions. It is argued that if one examines the issue of financial allocations by grouping the historically white institutions and the historically black institutions, one clearly finds allocations which favor the historically white institutions.

Plaintiffs' analysis disregards the allocation and definition of missions. It also ignores the relationship between the number and level of programs and the funding necessary to carry out those programs. If one follows mission precepts, no racial correlation can be inferred from an analysis of financial allocations to institutions on a per full-time equivalent student basis. Higher total per full-time equivalent student revenues and expenditures are found to differ between the comprehensive and noncomprehensive institutions; but this is true between white comprehensive and noncomprehensive institutions as well as black noncomprehensive institutions. Such differences are not indicative of educationally unreasonable or inequitable treatment of the historically black institutions. The educational expectation is that institutions with greater program breadth and research emphasis and greater emphasis on technical programs will reflect the higher per student total revenues and expenditures. Thus, while differences in level of funding obviously exist, these differences are not accountable in terms of race but rather are explained by legitimate educational distinc-

tions among institutions. The court finds influential the question posed by the defendants. If from the total funding allocated by the legislature, funds that had been allocated to a comprehensive university were taken by the Board and transferred to a black noncomprehensive university, thereby decreasing the availability or quality of a program or programs at the comprehensive university, what would be the effect on the black students attending the comprehensive university? Approximately 30% of all black college students attending four-year colleges in the state attend one of the comprehensive universities. To follow the plaintiffs' argument to its ultimate conclusion would decrease the quality of the programs available to that 30% of the state's black students.

#### 5. Land Grant Activities

Plaintiffs also argue for increased funding and resource allocation to the Alcorn State University's land grant programs. Plaintiffs point out that the land grant programs offered at Mississippi State University are vastly superior to those afforded students in the land grant programs at Alcorn State University. Plaintiffs contend that the factors which mark the Mississippi State University program as superior, for example, the greater breadth of course offerings and research opportunities, are the product of years of discrimination. It is also argued that additional resources for Alcorn State University would increase other-race presence at Alcorn and black participation in land grant activities.

Insofar as plaintiffs' argument can be construed as suggesting that Alcorn State University has standing to challenge the way in which the state has historically and at present allocates its educational resources among the institutions of higher learning, the court, as detailed above, finds that Alcorn State University is incapable of raising a legally cognizable challenge to such allocations. *See Williams v. Mayor and City Council of Baltimore,* 289 U.S. at 40, 53 S.Ct. at 432. To the extent plaintiffs' contentions are made on behalf of the students and faculty of Alcorn State University, we find that black citizens have

equal access to the remaining institutions of higher learning, including Mississippi State University, and that therefore plaintiffs have failed to make a showing that educational opportunity in the land grant area is in any way restricted. As the court has previously found, the defendants have allocated funds for land grant instruction in accordance with a racially neutral and an educationally sound funding formula. Further, the differentiations made by the defendants with respect to the nature of the land grant programs offered at the two land grant schools are educationally sound and are not motivated by discriminatory motive. Finally, the affirmative duty as defined by this court does not require the defendants to manipulate institutional missions, program offerings and facilities in an effort to maximize the racial integration of component institutions. Accordingly, the court finds plaintiffs' contentions to be without merit.

### D. Faculty and Staff Employment

The private plaintiffs and the United States contend that a review of historical and current patterns of employment of faculty and administrators, by race, reveals that this pattern, alone, continues to designate universities as intended for black or white students in accord with the institutions' historical racial designation. It is argued that because the defendants' former *de jure* system also encompassed faculty and staff employment, as well as the Board of Trustees staff employment, the affirmative duty to dismantle the former segregated system extends as well to this area. Further, plaintiffs point to alleged specific instances of discriminatory conduct directed towards black faculty and staff at several of the historically white institutions. It is argued that this evidence of intentional discrimination establishes a violation of the Fourteenth Amendment and 42 U.S.C. § 1981.

The evidence shows, however, that the defendants have adopted racially neutral hiring policies with respect to faculty and all staff at each of the institutions of higher learning, including the Board's own staff. Consistent with the defendants' stated objective of increasing employment of other-race faculty, the predominantly white institutions expend substantial affirmative efforts each year in attempting to attract and employ other-race faculty. There is an acute shortage of qualified black faculty applicants throughout the United States, and practically all universities are competing for a limited number of black teachers. Despite the acute shortage of supply of qualified minority faculty existing nationwide, the defendants' affirmative action policies have borne considerable fruit. Since 1974, the percentage of blacks hired exceeds the black representation in the qualified labor pool. Moreover, even though the turnover rate for black faculty is higher than it is for whites due to the high demand for black faculty existing nationwide, the present representation of blacks among the faculty at each of the five predominantly white institutions is statistically in line with the relevant labor market for faculty employed since 1974.

The court is not aware of any additional minority faculty and staff recruitment procedures the defendants could implement which would assure greater minority faculty and staff representation at the predominantly white institutions and minority staff representation within the Board of Trustees' own organization. The court, therefore, finds that the defendants' stated policy of nondiscrimination and affirmative commitment to the employment of other-race faculty and staff at every institution within the system, and the efforts undertaken pursuant to the stated policy, serve to fulfill their affirmative duty to dismantle the former segregated system as it pertains to faculty and staff employment.

### IV. Conclusion

From the many days of testimony and the thousands of pages of exhibits received by the court during this trial, it is very easy indeed to become concerned with the inefficiencies and wastefulness of the higher education system in the state which came out so clearly from the evidence; but the issues of this case are not about the inefficiency for example of having two state universities only 20 miles apart in the

eastern part of the state with separate administrations and duplicating programs, and two state universities on the western side of the state only 50 miles apart, each with separate administrations and duplicating programs. The issues are not about the economic efficiency of funding traditionally black and traditionally white universities which duplicate as many as 75% of each other's baccalaureate programs. Nor do the issues in the case deal with the wisdom of maintaining a system which required in the hard economic times of 1981–86 the first university of the state, the University of Mississippi, to drop more programs than was required of a smaller, non-comprehensive university; nor do the issues deal with the attempt by the state to maintain three comprehensive universities which compete with each other for the financial resources available, when larger surrounding states with larger higher education budgets maintain only one premier comprehensive university per state.

What the issues of this case are about are the Constitution and the laws of the United States as they apply to the offering of higher education by the State of Mississippi to its citizens and whether any practices or policies of the State in the higher education field are racially motivated to bring about results which deprive black citizens of benefits provided to white citizens.

In summary, the court finds that current actions on the part of the defendants demonstrate conclusively that the defendants are fulfilling their affirmative duty to disestablish the former *de jure* segregated system of higher education. The defendants have adopted race-neutral policies and procedures in the areas of student admission and recruitment and in the areas of faculty and staff hiring and resource allocation. The defendants have also undertaken substantial affirmative efforts in the areas of other-race student and faculty-staff recruitment and funding and facility allocation. It is obvious from the testimony presented that the defendants undertake to fund more institutions of higher learning than are justified by the amount of financial resources available to the state,

but that is a policy decision of the legislature that affects the quality of the institutions among which the monies must be so thinly divided. Such a decision by the legislature goes to the quality of the institutions and not to the constitutionality of the funding. The differentiations made by the defendants with respect to each of the individual institutions in the designation of institutional missions are reasonable and were not motivated by discriminatory purpose. The court finds no proof in this record of current violation of the Constitution or Statutes of the United States by the defendants. This case should therefore be dismissed.

Let an order issue accordingly.